OPINION OF THE COURT
Fuchsberg, J.
Plaintiff Ruder & Finn, a public relations firm and the insured under a so-called “Libel Policy”,[1] seeks to recover for the attorneys’ fees and disbursements it incurred in the successful defense of two suits which its insurer, defendant Seaboard Surety Company, disclaiming coverage, refüsed to defend. The issue boils down to whether the allegations of fact or legal theory in each of the two actions brought the claims they asserted sufficiently within the embrace of “defamation” or “unfair competition”, two of the kinds of claims against which the insuring agreement undertook to *667 defend and, if necessary, indemnify.[2] The carrier’s agreement to defend, cast in language commonly employed in liability policies, called for a defense “ ‘even if such suit is groundless, false or fraudulent’ ” (see Goldberg v Lumber Mut. Cas. Ins. Co. of N. Y., 297 NY 148, 151).
This clause was first invoked by plaintiff when it was served with a summons and complaint issued out of the Federal District Court for the Southern District of New York at the behest of ATI, Inc. (Aerosol Technique), a manufacturer and packager of aerosol products. That complaint alleged that the insured had conspired with others to coerce ATI into retaining it to combat adverse publicity that the fluorocarbon propellants found in aerosol products endangered the earth’s ozone layer. Most pointedly for our purposes, it went on to state that the publicity “unfavorably and falsely desparaged [sic] * * * ATI’s aerosol products.”
According to the pleader, tlie issuing source of the anti-aerosol publicity was a codefendant, PIPE, Inc. (Public Interest Public Relations), presumably a nonprofit organization, founded by William Ruder, president of Ruder & Finn, to serve public interest groups and causes.[3] Ruder and two other individuals associated with both Ruder & Finn and PIPE completed the role of defendants ATI had joined. In this instance, PIPE is alleged to have entered the picture at the request of the Natural Resources Defense Council, an environmental organization. In essence, the *668 coercion was said to derive from the dual relationship between Ruder & Finn’s people and PIPR, most particularly William Ruder’s concomitant ability to act as intermediary between the Defense Council and ATI.
Its carrier having rejected the demand that it assume responsibility for defending this litigation, Ruder & Finn, through engaged counsel of its own choice, subsequently obtained its dismissal for lack of subject matter jurisdiction.[4]
Some three weeks later, ATI sued for a second time, thus providing a second occasion for Seaboard Surety’s refusal to take over a defense under the policy. The venue for the new suit, against the identical defendants and obviously rooted in the same background, was laid in the New York Supreme Court, New York County. The complaint this time alleged, much as it had in the initial litigation, that the defendants had engaged in a conspiracy to disseminate anti-aerosol publicity which, if successful, “would have the effect of ruining and destroying the aerosol business in general and driving [ATI] out of business”. It further set forth that the “adverse publicity” thus promulgated “did in fact have the intended effect of causing substantial injury to the aerosol industry in general and to [ATI] in particular by inducing the general public to boycott aerosol products”. In a second cause of action, ATI added that the conduct in furtherance of the conspiracy was “intentional and malicious and designed to intimidate and coerce plaintiff to its financial detriment by threatened interference with and destruction of plaintiff’s business, business relations and contracts”, all presumptively because of “plaintiff’s failure to retain the services of * * * Ruder & Finn”. But, after all this, notably absent was any repetition, directly or indirectly, of the allegation that the defendants “falsely disparaged” ATI’s aerosol products.
Though it now was put through a longer course, the policyholder, once more compelled to retain its own counsel, again won a dismissal, this time for ATI’s failure to state *669 a good cause of action. On appeal, the ensuing order and judgment of the Supreme Court were affirmed by the Appellate Division and, finally, on appeal to this court, finding that ATI’s contention that it had stated a valid cause of action for prima facie tort was without merit, we too affirmed (ATI, Inc. v Ruder & Finn, 42 NY2d 454) .[5]
With all this before it, on cross .motions for summary judgment, Special Term held that the facts pleaded in neither the underlying Federal nor the State action came within the insurance policy’s coverage, and that Seaboard, therefore, was within its rights in denying any duty to defend. But the Appellate Division, disagreeing in part, modified that determination by finding that Seaboard was required to defend the Federal action and thereupon, pursuant to CPLR 5713, granted each side leave to appeal, in the process certifying the following question for our review: “Was the order of this Court, which modified the order of the Supreme Court, properly made?” Because we believe it was, we now affirm.[5]
[6]
It is a well-established legal principle that the duty of an insurer to defend is broader than its duty to pay (Goldberg v. Lumber Mut. Cas. Co. of N. Y., 297 NY 148, 154, supra). The duty to defend arises whenever the allegations in the complaint fall within the risk covered by the policy. It therefore includes the defense of those actions in which alternative grounds are asserted, even if some are *670 without the protection purchased. Further, a policy protects against poorly or incompletely pleaded cases as well as those artfully drafted. Thus the question is not whether the complaint can withstand a motion to dismiss for failure to state a cause of action. Nor is the insured’s ultimate liability a consideration. If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be (International Paper Co. v Continental Cas. Co., 35 NY2d 322,325; Lionel Freedman, Inc. v Glens Falls Ins. Co., 27 NY2d 364, 368; Goldberg v Lumber Mut. Cas. Ins. Co. of N. Y., 297 NY 148, 154, supra).
Before applying these standards to ATI’s two complaints, some comments are in order on the nature of the torts— defamation and unfair competition — which, among those listed in the insuring clause, are the ones about which this coverage dispute revolves. For only with their scope in mind can we determine whether the pleadings set out claims which, whether pleaded well or clearly, on the one hand, or poorly or obscurely, on the other, can be said to sound in these civil wrongs.
We start with product defamation, whose delineation is relatively uncomplicated. Perhaps more properly known in this context as product disparagement, legal historians trace its ancestry to the common-law tort of slander of title. Fashioned originally to provide a remedy against one who cast oral aspersions upon the legitimacy of an owner’s right to his land, as this tort evolved it was enlarged to cover written aspersions as well. Next it was extended to include title to property other than land and, eventually, to the disparagement of the quality of, as distinguished from title to, property (Prosser, Torts [4th ed], p 915 et seq.).
Now, although defamation and disparagement in the commercial context are allied in that the gravamen of both are falsehoods published to third parties, there is a distinction. Where a statement impugns the basic integrity or creditworthiness of a business, an action, for defamation lies and injury is conclusively presumed. Where, however, the statement is confined to denigrating the quality of the business’ goods or services, it could support an action for *671 disparagement, but will do so only if malice and special damages are proven (see Drug Research Corp. v Curtis Pub. Co., 7 NY2d 435; Marlin Fire Arms Co. v Shields, 171 NY 384, 390; Competitive Torts, 77 Harv L Rev 888, 893-894).
The reach of “unfair competition”, however, appears to invite more controversy. The insured here asserts that the doctrine is a flexible one, best characterized as the law of “commercial unfairness”. From that generality, it would extrapolate that, because the tort is neither defined nor limited by the insurance policy, it should be given the broadest possible interpretation. On that premise, it would have us put within the definition of unfair competition property rights of commercial value which are subject to any form of commercial immorality.
The insurer, on the other hand, while accepting the general rule of construction pertaining to insurance policies— that all ambiguities to the meaning of a policy must be resolved in favor of the insured (Miller v Continental Ins. Co., 40 NY2d 675, 678) — contends that the definition of “unfair competition” “does not have boundless application as a remedy for unfair trade practices” (Alfred Dunhill Ltd. v Interstate Cigar Co., 499 F2d 232, 237). Rather, it goes on, the primary concern in unfair competition is the protection of a business from another’s misappropriation of the business’ “organization [or its] expenditure of labor, skill, and money” (International News Serv. v Associated Press, 248 US 215, 239).
We believe that the insurer’s position accurately reflects the long-abiding state of the law on the subject. Even the case on which the insured relies for its broad-ranging definition of unfair competition accepts the principle of misappropriation of another’s commercial advantage as a cornerstone of the tort (see Dior v Milton, 9 Misc 2d 425, 431, 435, affd 2 AD2d 878). It follows that the policy’s phrase “unfair competition” is not to be equated with the far more amorphous term “commerical unfairness”.
No succor, therefore, is to be had by the plaintiff from the fact that an actuarially oriented insurance carrier, in computing premiums for underwriting purposes, will have *672 taken into account the recognized rule requiring that ambiguities be resolved in favor of its insureds. The simple answer, of course, is that there just was nothing ambiguous about “unfair competition” in the present context. To redefine these words at this point is to ignore the importance of stability to the law governing commercial and property relationships (People v Hobson, 39 NY2d 479, 489).
Coming now to the Federal suit, it is evident that the pleading there alleged sufficient facts as to product disparagement to come within the policy’s coverage. While in that case the complaint’s first cause of action was couched in terms of restraint of trade, it went on to allege that those whom it had joined as defendants were engaged in “false disparagement” of aerosol products in an effort to coerce ATI into retaining the Ruder & Finn firm to do public relations work. ATI further claimed that as a result of the alleged scheme it had suffered grievous financial losses. These facts, though found deficient to sustain the Federal antitrust claim, painted a picture which, had it been established, conceivably could have subjected defendant’s insured and its codefendants to liability for commercial disparagement. Albeit the policy speaks in terms of “defamation” rather than “disparagement”, we find the tort to which it refers within the scope of the insuring clause’s protection. The conceptual similarities between these torts, the semantic sameness which laymen might ascribe to them (compare “defamation” with “disparagement” as defined in Webster’s Third New International Dictionary) and, again, the rule of construction resolving ambiguities against the insurer all support this position.
True, the pleadings failed to allege special damages, but, as noted earlier, the absence of an element of a properly pleaded cause of action is of no moment in determining Seaboard’s duty to defend. For that matter, neither did the fact that there was no colorable basis for Federal jurisdiction relieve Seaboard of its obligation. Rather, the latter merely provided the insurer with what in fact turned out to be a sure-fire defense in the Federal District Court.
The suit in our State courts is another story. Although the complaint there was based upon the same chain of events *673 which precipitated the Federal complaint, it was more narrowly focused. The gap between the two complaints was material, and, in the present context, is decisive.
While the State complaint did allege that ATI was injured by PIPR’s dissemination of adverse aerosol publicity in furtherance of the Defense Council’s program, the complaint contained not even a hint that the information conveyed was false, much less knowingly so. Instead, the claim was solely and explicitly that it was antiaerosol. Indeed, a fair reading of the complaint shows an attempt to state a cause of action, not for defamation, but for prima facie tort — the infliction of intentional harm.[7] And, as to unfair competition, no matter how adverse their aerosol campaign, the defendants were not competitors of ATI, did not work for competitors of ATI and were not attempting to appropriate to themselves any profit, property or advantage belonging to ATI. Therefore, unlike the Federal action in which too no claim of unfair competition was discernable, but where the defamation allegation triggered the duty to defend, in the State litigation there was no support for such an obligation on either account.
It follows, for these reasons, that the certified question should be answered in the affirmative and that the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order affirmed, without costs. Question certified answered in the affirmative.

. In addition to Ruder & Finn, the policy covered “any affiliate or subsidiary corporation which it owns or controls as they are now or may hereafter be constituted”. Any “employee ** * * partner, executive officer or director thereof * * * acting within the scope of his duties” was also insured.

. The policy’s complete description of the conduct it covers is:
“1. To pay on behalf of the Insured all sums which- the Insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed by him under contract as defined herein, as the result of any final judgment for money damages resulting from:
“(a) libel, slander, defamation or
“ (b) any infringement of copyright or of title or of slogan or
“(c) piracy, plagiarism, or unfair competition or idea misappropriation under implied contract or
“(d) any invasion of rights of privacy committed or alleged to have been committed in any advertisment, publicity article, broadcast or telecast and arising out of the Insured’s business of Advertising Agents.
“2. To defend, in the name and on behalf of the Insured, any suit seeking damages for any of the above causes, even if such suit is groundless, false or fraudulent.”

. Because PIPR was neither an affiliate nor a subsidiary of Ruder & Finn, it was not an insured party under the Libel Policy (see n 1, infra).

. The decision of the District Court (76 Civ 74, March 6, 1976 [Owen, J.]) finding no cause of action for antitrust violations is apparently not officially reported.

. As indicated before our court, the parties only argued whether a cause of action for prima facie tort was pleaded. However, it may he noted, in connection with a later point, that Special Term had read the pleadings as purporting to assert four possible theories of recovery: conspiracy, duress, defamation and prima facie tort. Nevertheless, in opposing defendant’s successful motion to dismiss the complaint in that court, ATI, in hewing closely to the line that the “true nature” of its complaint was “prima facie tort”, insisted that any assertion that it sounded in either “conspiracy, duress and defamation” was “incorrect”. It also specifically repeated that the complaint did not allege “defamation”.

. Plaintiff alleged that it had expended $74,966.18 for counsel fees and disbursements in the defense of the underlying cases. Notwithstanding this specific damages allegation, however, it is not entirely clear from the face of the complaint in the present action whether plaintiff sues for breach of contract or for declaratory judgment. However, since the two courts below elected to treat it as one seeking a declaration of rights under the insurance policy and the appeal is here on a certified question, we see no reason to alter this pleading posture.

. We find without merit the insured’s contention that its insurer is estopped, because of the application of the now largely supplanted common-law practice of “vouching-in” (3 Carmody-Wait 2d, NY Frac, § 19:132), from challenging Special Term’s comment in the original State court action that the complaint’s allegations evidenced an intention to plead defamation. There is, however, no need to pass on whether “vouching-in” would ever apply in these circumstances, for ATI’s consistent and persistent denials of any assertion of a claim of defamation (see n 4, infra) rendered Special Terms’ statements mere dictum and not binding on the parties in any event.