**BROOKLYN LAW SCHOOL, Plaintiff,**

v.

**The AETNA CASUALTY & SURETY COMPANY and Aetna Life & Casualty, Defendants.**

**No. 84–CV–4663.**

United States District Court, E.D. New York.

May 29, 1987.

---

**6.** Given this disposition, the Court need not consider plaintiff's application for sanctions against Mr. DeMarco.

Vivian Shevitz, Brooklyn, N.Y., for plaintiff.

Bower & Gardner, New York City; Barry G. Saretsky, Sidney Rosen, of counsel, for defendants Aetna Cas. and Sur. Co. also incorrectly sued herein as Aetna Life & Cas.

BARTELS, District Judge.

The genesis of this case is predicated upon a series of five separate and harassing lawsuits instituted by a disgruntled former law professor, William S. Herrmann, against his employer, Brooklyn Law School (hereinafter "Law School") and a number of its trustees, faculty and students, which were entitled as follows:

(1) *Herrmann v. Lisle* (U.S.Dist.Ct., E.D.N.Y., 75 Civ. 1309 (CPS)) (action for damages for defamation);

(2) *Herrmann v. Brooklyn Law School* (Sup.Ct. Kings Co., Index No. 22364/75) (action for damages and for injunction);

(3) *In Re Herrmann v. Brooklyn Law School* (U.S.Dist.Ct., E.D.N.Y., 75 Civ. 2159 (JM)) (Article 78 proceeding and damage claims);

(4) *Herrmann v. Moore* (U.S.Dist.Ct., E.D.N.Y., 76 Civ. 2269 (GCP)) (action for damages for humiliation and wrongful discharge); and

(5) *Herrmann v. Moore, et al.* (Sup.Ct. N.Y. Co., Index No. 23498/76) (action for damages for tortious interference with contract and breach of contract).

The Law School was compelled to defend these cases although it had insurance with the defendants, Aetna Casualty & Surety Company and Aetna Life & Casualty ("Aetna"), which refused to defend the suits. Therefore plaintiff brought this action based upon diversity citizenship against the defendants, asserting that Aetna breached its duty to defend and pay settlement costs arising out of this series of the above-mentioned lawsuits brought by Herrmann.

At the time Herrmann brought his first three suits in 1975, the Law School held two liability insurance policies from Aetna, (1) a Special Multi-Peril Policy ("Multi-Peril"), and (2) an Excess Indemnity (Umbrella) Policy ("Umbrella"), both of which provided coverage for various liabilities including, *inter alia*, libel, slander, malicious prosecution, and racial discrimination, subject to various exclusions in the policies and attached endorsements. Upon receiving Herrmann's first complaint, the Law School called upon Aetna under the policies to defend against Herrmann's claims. Aetna denied that either policy provided coverage for the claims made by Herrmann and denied any duty to provide legal assistance for the Law School. Thereupon the Law School retained counsel to defend itself and faculty in this series of suits brought by Herrmann. Further requests for a defense in the subsequent fourth and fifth lawsuits were also denied by Aetna. Consequently, plaintiff now moves for a summary judgment against the defendants pursuant to Rule 56(a) of the Federal Rules of Civil Procedure for $315,000 plus interest.

## BACKGROUND

The Law School, founded in 1901, is a private non-profit educational institution well established in the educational community, governed by the Board of Trustees whose members serve without compensation. William S. Herrmann was, until his dismissal on September 17, 1975, a tenured professor at Brooklyn Law School. For several years prior to his dismissal Herrmann felt that he was being underpaid by the Law School. In April, 1973, after heated negotiations over salary increases in which faculty members made disparaging comments about each other's performances, Herrmann received what he considered an inadequate salary increase for the coming academic year. On April 2, 1973, Herrmann brought a slander action against a fellow faculty member alone, Professor Joseph Crea, for defamatory statements allegedly made by Crea in the course of the negotiations. The Law School did not request any assistance from Aetna concerning this lawsuit.

Subsequently, Herrmann filed another lawsuit, *Herrmann v. Lisle, et al.* ("Suit (1)"), the first of a series of five lawsuits that are the subject of this action. This suit was brought against the Dean of the Law School Raymond Lisle, Professor Crea, Professor Phillip K. Younge, and David G. Trager, who at the time of the complaint was on leave from the Law School and serving as U.S. Attorney for the Eastern District of New York. The complaint in Suit (1) alleged four causes of

action. The first cause of action against all defendants alleged *prima facie* tort for conspiring to deprive Herrmann of his position with the Law School and defame him in the political and legal communities. The second, third, and fourth causes of action alleged defamation on the part of Lisle, Trager, and Younge, respectively.

By letter dated February 11, 1975, the summons and complaint in Suit (1) were forwarded to the Law School's insurance broker with the advice that all charges made against the defendant professors fell within the scope of their official duties at the Law School. By letter dated February 28, 1975, Aetna disclaimed any duty to provide a defense or indemnification with respect to this action under the policies held by the Law School.

The Law School's Board of Trustees, upset by the severely disruptive effect on the Law School of this litigation, met to consider whether proceedings should be initiated regarding the propriety of Herrmann's actions. The trustees decided that the filing of Suit (1) alone did not constitute grounds for disciplinary hearings against Herrmann; however, when the trustees learned that Herrmann had written a letter to the Character and Fitness Committee of the Bar Association which unfairly accused a witness student of perjury in the lawsuit against Crea, the trustees altered their conclusions. By resolution dated May 19, 1975, the Board of Trustees directed the full faculty to conduct a hearing regarding Herrmann's conduct. Charges were drafted against him and served upon him in July, 1975.

Herrmann responded with a second lawsuit. In *Herrmann v. Brooklyn Law School*, filed in Kings County Supreme Court, Index No. 22364/75 ("Suit (2)"), he alleged that the charges at the faculty hearing had been "maliciously and willfully" asserted against him (Complaint, Par. 27). Herrmann moved to enjoin the Law School, Dean Lisle, and two other faculty members from taking any action in the scheduled hearing. He also sought damages in the amount of One Million Dollars ($1,000,000). On August 7, 1975, Judge Beckinella denied the request for an injunction. After this denial, Herrmann continued his action for damages.

The Law School did not provide written notice to Aetna about the new events which gave rise to the second lawsuit, nor did the Law School forward the summons and complaint to Aetna promptly after receiving service, which the plaintiff admits is required.

The Law School faculty convened a hearing on August 18, 1975, and on August 21 recommended to the Board of Trustees that Herrmann be dismissed and his tenure revoked. The Board approved this recommendation and dismissed Herrmann on September 17, 1975.

Herrmann responded with the third lawsuit involved in this case, *In Re Herrmann v. Brooklyn Law School* (U.S.Dist.Ct., E.D. N.Y., 75–CV–2159) ("Suit (3)"). Herrmann sought reinstatement as a professor of law, restoration of his tenured status, One Million Dollars ($1,000,000) in damages, and punitive damages. He essentially charged that the Law School used improper procedures in dismissing him. As in his previous complaint, Herrmann made a great number of accusations which might be construed as claims of due process denial, malicious prosecution, wrongful discharge, mental anguish, and damage to reputation. This litigation was dismissed by the federal district court on June 30, 1976 for lack of subject matter jurisdiction, and an appeal of this decision was dismissed by the Second Circuit on October 7, 1976. As with the second lawsuit, no written notice was ever provided to Aetna concerning this Article 78 proceeding.

In December, 1976 Herrmann filed the fourth and fifth lawsuits involved. By letter dated February 4, 1977, Dean Lisle transmitted these complaints to the Law School's insurance broker, asking that Aetna be notified in order to obtain coverage under the Umbrella policy. By letter dated February 22, 1977, Aetna disclaimed any duty to defend either suit under either the Multi-Peril or Umbrella policies.

Herrmann's fourth lawsuit filed in federal court essentially was a section 1983 ac-

tion challenging his dismissal on equal protection and privileges and immunities theories, but again contained a wide series of rambling accusations. *Herrmann v. Moore* (U.S.Dist.Ct., E.D.N.Y., 76 Civ. 2269 (GCP)) ("Suit (4)"). The complaint in this case named the Law School and thirty-eight individual members of the Board of Trustees, faculty, and student body, seeking One Million Dollars ($1,000,000) damages. On October 19, 1977, this action was dismissed for lack of any state action or any class-based discrimination necessary to establish a claim under 42 U.S.C. § 1985. Herrmann's subsequent appeal was also denied.

Herrmann filed a fifth suit in state court seeking Two Million Dollars ($2,000,000) in damages and alleging breach of contract and tortious interferences with contractual relations. *Herrmann v. Moore, et al.,* (Sup.Ct.N.Y.Co., Index No. 23498/76) ("Suit (5)"). The complaint in this case, unlike Herrmann's other complaints, was straightforward and stated two clear causes of action. It charged the Law School with breach of contract, and then charged individual defendants with intentional interference in his contractual relations with the Law School. There were no allegations of defamation or malicious prosecution.

The claims made against individual defendants in Suit (5) were promptly dismissed by the state court and affirmed on appeal. The case against the Law School proceeded to trial, following the denial of a summary judgment motion made by the Law School. Herrmann was awarded by the jury $150,000 damages. The state court denied the Law School's motion to set aside the verdict, except on the issue of damages, which it found to be excessive. The court then reduced the damage award to $20,000 and ordered a new trial if plaintiff refused to accept the reduction. Herrmann refused, and after an appeal, the case was set down for a new trial on damages.

In April, 1984 the Law School settled the two lawsuits, which were Suits (2) for damages and injunction and (5) for tortious interference and breach of contract, for $75,000, which terminated all litigation initiated by Herrmann against the Law School community.

## DISCUSSION

It is not necessary in this case to enumerate all the principles of law governing an insurer's duty to defend. It is necessary to point out, however, some of the elementary principles and to emphasize that an insurer's duty under New York law to defend, under policies such as those involved in this case, is broader than its duty to indemnify. *Goldberg v. Lumber Mutual Casualty Ins. Co.,* 297 N.Y. 148, 154, 77 N.E.2d 131 (1948). The allegations of the complaint must be liberally construed and if they arguably fall within a risk covered by the policies, then the insurer is required to defend regardless of how groundless, false or baseless the suit may be. *International Paper Co. v. Continental Casualty Co.,* 35 N.Y.2d 322, 325–326, 361 N.Y.S.2d 873, 875–876, 320 N.E.2d 619, 620–622 (1974). Further, "a policy protects against poorly or incompletely pleaded cases as well as those artfully drafted." *Ruder & Finn, Inc. v. Seaboard Surety Co.,* 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 861, 422 N.E.2d 518, 521 (1981). If the complaint against the insurer asserts a single claim within the policy's coverage, the insurer must defend the entire action, even though the complaint asserts additional claims or alternative theories clearly falling outside the policy's coverage. *Seaboard Surety Co. v. Gillette Co.,* 64 N.Y.2d 304, 310, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 273–74 (1984). On the other hand, the insurer is not obliged to defend if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer might eventually be held to be obligated. *Spoor-Lasher Co. v. Aetna Casualty & Surety Co.,* 39 N.Y.2d 875, 876, 386 N.Y.S.2d 221, 222, 352 N.E.2d 139, 140 (1976), or the insurer can show that "the allegations of the complaint are solely and entirely within the policy exclusions, and that the allegations, *in toto,* are not subject to any other interpretation." *International Paper Co. v. Continental Casualty Co.,* 35

N.Y.2d at 325, 361 N.Y.S.2d at 875, 320 N.E.2d at 621.

Finally, absent a valid excuse, a failure to satisfy the notice requirements of a policy vitiates the policy, and the insurer has no liability. *Security Mutual Insurance Co. of New York v. Acker-Fitzsimmons Corp.*, 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972); *Aetna Casualty & Surety Co. v. Lanza*, 70 A.D.2d 508, 415 N.Y.S.2d 859 (1st Dep't 1979). Before it can assert the defense of noncompliance with notice provisions, the insurer need not show prejudice. *Security Mutual*, 31 N.Y.2d at 440, 340 N.Y.S.2d at 905, 293 N.E.2d at 78.

With these principles in mind the Court has compared the allegations of each of the five complaints with the terms of both the Multi-Peril policy and the Umbrella policy in order to ascertain Aetna's liability. *See Servidone Construction Corp. v. Security Insurance Co.*, 64 N.Y.2d 419, 424, 488 N.Y.S.2d 139, 142, 477 N.E.2d 441, 444 (1985). After such comparison the Court has reached the following conclusions:

### Suit (1) (Defamation)

■ Referring to Suit (1), there is no coverage under the Multi-Peril or Umbrella policies because each policy contains exclusions for employment-related injuries. Exclusion (c) of the Personal Injury Endorsement of the Multi-Peril policy excludes *"personal injury sustained by any person as a result of an offense directly or indirectly related to the employment of such person by the named insured."* (Emphasis ours.) Under this provision, Aetna is absolved of its duty to defend this suit because the professors sued are clearly Brooklyn Law School employees and their dispute with Herrmann involved their activities as faculty of the Law School. This provision applies both to the Law School as named insured and also to the additionally insured employees added in the Additional Insured Endorsement. *See Interco Inc. v. Mission Insurance Co.*, 808 F.2d 682 (8th Cir.1987); *Bellefonte Insurance Co. v. Wayson*, 489 F.Supp. 58 (D.Alaska 1980).

The employment-related clause in the Umbrella policy differs from that of the Multi-Peril policy. Section 3.1(h) of the Umbrella policy specifies that *"[t]his policy does not apply ... to any person while engaged in the business of his employer, with respect to personal injury to any fellow employee of such person injured in the course of his employment ..."* (Emphasis ours.) Section 3.1(h) excludes coverage for the professors in Suit (1) because they were clearly Herrmann's fellow employees and were accused of causing him injury while performing their duties. This section would not exclude coverage for the Law School as a named party, but the Law School was never named or joined in Suit (1) and cannot claim coverage merely because its employees are sued.

■ The difference between these two exclusions is crucial. Essentially, Exclusion (c) of the Multi-Peril policy excludes a category of injury because it happens to an employee, namely Herrmann, while Section 3.1(h) of the Umbrella policy only excludes employees who injure their co-workers, and does not exclude their employer's coverage for the injury itself. Accordingly, coverage for injuries in any of the five lawsuits is excluded under the Multi-Peril policy. The only possible coverage in any of the lawsuits is for the Law School and its trustees under the Umbrella policy, if coverage for the injuries alleged otherwise exists under its terms.

Despite the language of the policies, the Law School argues that these exclusions of employment-related injuries only apply to claims already covered under the Workmen's Compensation Law. Basically the exclusion should only be applied to bodily injuries, and not to other types of torts. The cases plaintiff cites in support of this argument are inapplicable to the case at bar. *Weiss v. Employers' Liability Assur. Corp.*, 131 Misc. 301, 226 N.Y.S. 732 (1st Dep't 1928); *Shapiro v. Employers' Liability Assurance Corp.*, 139 Misc. 454, 248 N.Y.S. 587 (S.Ct.1931); *Western Casualty & Surety Co. v. Teel*, 391 F.2d 764 (10th Cir.1968). These cases involve instances of bodily injury where the courts were trying

to determine whether the tort victim was an employee or not. In the present case, there is no doubt that Herrmann was an employee of the Law School. Consequently, the authorities cited offer no guidance whatsoever concerning the alleged distinction between bodily injuries and other personal injuries, which is the crux of the plaintiff's argument.

The Court also rejects Aetna's argument that the trustees of the Law School should be considered "employees" under both policies. Because of their role in the management of the Law School, they can only be considered its directors or officers for purposes of the policies. Directors and officers are covered under Section II(c) of the Personal Injury Endorsement of the Multi-Peril policy and Section 3(d)(1) of the Umbrella policy. No trustees are named as defendants in Suit (1), but they are named in Suits (4) and (5), which are the only cases which present the distinction.

### Suits (2) (Injunction) and (3) (Article 78)

■ Suits (2) and (3) are not covered by either policy because no appropriate notice was sent to Aetna. It is clear that both policies require at least written notice to the insurer of any occurrences which might involve the coverage of either policy. *See* Umbrella policy Section 6.3 and Multi-Peril policy Condition 4(b).[1] The Law School concedes it gave no notice, written or otherwise, with respect to the occurrences described in Herrmann's Suits (2) and (3).

The Law School argues, however, that all five suits essentially allege the same conspiracy, used by Herrmann to attack the Law School, and that if Aetna had defended the first lawsuit, as it was obligated to do, it would have had notice of the subsequent suits brought by Herrmann. This argument is flawed because there was no obligation upon Aetna to defend Suit (1) and, moreover, the insurer could not possibly know about the subsequent suits with new grievances based upon subsequent events.

### Suit (5) (Breach of Contract)

■ We consider Suit (5) next, because its disposition is obvious and presents no problem. Suit (5) is a very straightforward complaint and, unlike Herrmann's other four suits, states only claims for breach of contract and tortious interference with contractual relations. There is no coverage in any provision of either the Multi-Peril or Umbrella policies for the contractual claims and tortious interference therewith in Suit (5). Consequently, there is no duty to defend this suit.

### Suit (4) (conspiracy, etc., wrongful discharge)

Finally, this leaves for consideration Suit (4), which contains a plethora of words, some of which is simply gobbledygook. The gravamen of this suit is that the defendants conspired to deny Herrmann the equal protection and privileges and immunities of the laws under the Constitution of the United States and the Constitution of the State of New York, and further, that the acts of the defendants were illegal and done to deprive Herrmann of his property

1. The Multi-Peril policy contains the following terms in its CONDITIONS section:

4. *Insured's Duties in the Event of Occurrence, Claim or Suit*

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, . . . shall be given by or for the insured to the company . . . as soon as practicable. . . .

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by him or his representative.

The Umbrella policy contains the following terms in Section 6:

6.3 *Insured's Duties in the Event of Occurrence, Claim or Suit*

(a) Notice of Occurrence. Upon the happening of any occurrence reasonably likely to involve any of the coverages of this policy, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place, and circumstances thereof, . . . shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

rights in his tenured position. He further alleged that these acts and conspiracies caused him mental anguish, impaired his academic freedom, and damaged his reputation and standing in the educational community.

■ To begin with, conspiracy is an act of intent and as such is excluded under the definition of "occurrence" as that term is used in both policies.[2] Another problem raised by this complaint is whether Herrmann's asserted theories of recovery come within the provisions of the Umbrella policy, which is the only policy that is relevant. That policy enumerates the personal injuries it covers in Section 5.10 and includes, *inter alia,* racial or religious discrimination, malicious prosecution, defamation, and mental anguish.[3] The Law School claims that Aetna had a duty to defend arising out of all these causes of action in Suit (4), which are discussed as follows:

**"Race Discrimination" and "Humiliation"**

■ Race discrimination was Herrmann's basic accusation in Suit (4). Section 5.10 of the Umbrella policy lists "humiliation or racial or religious discrimination ... unless committed at the direction of the insured ..." as a risk covered. Herrmann alleged that the discrimination practiced against him resulted from a conspiracy between the Law School and the individuals named in the complaint. His pleading alleges an intentional discrimination which certainly qualifies under the term "act at the direction of the insured" and such acts are specifically excluded. Therefore, his

discrimination claims are not covered by the Umbrella policy.

**"Defamation"**

■ The Law School argues that Herrmann's complaint in Suit (4) also states a poorly drafted claim of defamation. Under New York law, injury to reputation is the gist of an action for defamation. Any communication, spoken or written, concerning an individual which tends to expose him to public contempt, ridicule, or disgrace, or injure him in his profession is defamatory. *See Lawlor v. Gallagher President's Report, Inc.,* 394 F.Supp. 721, 726 (S.D.N.Y. 1975) (citing cases). A plaintiff must prove that the communication is untrue and caused special damages. *See National Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. 374 (S.D.N.Y.1980).

■ The Court is aware, as noted above, that groundless or incompletely pled complaints must still be defended by an insurer, but this principle has its limits. In *Ruder & Finn, Inc. v. Seaboard Surety Co.,* 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981), a public relations firm which was insured under a "Libel Policy" covering "defamation" and "unfair competition," was sued by a manufacturer of aerosol products for causing adverse publicity that unfairly and falsely disparaged the aerosol products.

The Court rejected the policyholder's contention that the policy's "unfair competition" clause could apply to the aerosol man-

---

**2.** Section 5.9 of the Umbrella policy defines "occurrence" as

> *an accident* including continuous or repeated exposure to conditions which results in personal injury, property damage or advertising offense which is neither expected nor intended from the standpoint of the insured (emphasis added).

*See also* DEFINITIONS section of the Multi-Peril policy.

When Herrmann alleges a conspiracy against him by the Law School community, it can be assumed that he charges all named individuals with committing acts with the specific intent to cause him harm. This falls outside even the broadest interpretations of the term "accident." *See McGroarty v. Great American Insurance Co.,*

36 N.Y.2d 358, 363–64, 368 N.Y.S.2d 485, 489–90, 329 N.E.2d 172, 174–75 (1978).

**3.** Personal injury is described in Section 5.10 as follows:

> "personal injury" means bodily injury, shock, mental anguish, sickness or disease, including death at any time resulting therefrom, injury arising out of false arrest, detention or imprisonment, malicious prosecution, ... humiliation or racial or religious discrimination (unless committed by or at the direction of the insured, or unless insurance therefor is prohibited by law), and, ... injury arising out of the publication or utterance of a libel or slander or of other defamatory or disparaging material or a publication or utterance in violation of an individual's right of privacy.

ufacturer's complaint because the "unfair competition" provision applied to any claim of commercial unfairness made against a policyholder. Instead the court interpreted the term "unfair competition" in light of well-recognized law, and ruled that the aerosol manufacturer's claims were too amorphous to be termed an "unfair competition" claim. *Id.* 439 N.Y.S.2d at 862, 422 N.E.2d at 522. The court used the same analysis when considering the "defamation" provision of the policy and its application to claims in a state court suit. It rejected the policyholder's claim for coverage against allegations of an intentional infliction of economic harm because the manufacturer never alleged that the adverse publicity concerning aerosol products was false, thereby omitting a fundamental element of any recognizable defamation claim. The court therefore concluded that the aerosol manufacturer did not attempt to make a claim of defamation in the state suit, but only a claim for *prima facie* tort. *Id.* at 863, 422 N.E.2d at 523.

 So here the Law School argues that Paragraph 25 of Herrmann's complaint states a claim of defamation, because it alleges that the defendants "performed acts to humiliate and humble him."[4] Further, Paragraph 20 of the complaint claims that "his reputation and standing prestige

in the educational community have been severely damaged."[5] Read as a whole, the complaint alleges that members of the Law School community conspired and acted to deny Herrmann equal protection and privileges and immunities under the Constitution of the United States and of the State of New York. In Paragraph 25 he claims that the Law School community humiliated and humbled him in order to chill his constitutional rights. In Paragraph 20 he enumerates the damages caused by the conspiracies against him. He laments his loss of a tenured position, mental anguish, soiled reputation, and impaired pension rights. Neither Paragraph 20 nor Paragraph 25 attempts to state libel or slander as a theory of recovery. Nowhere in Suit (4) does Herrmann allege that anyone made false statements about him which harmed his reputation. These phrases in Suit (4) differ noticeably from the complaint in Suit (1), where Herrmann clearly accused his fellow professors of making defamatory statements. Complaint in Suit (1), paragraphs 61, 68, and 80.[6] Although Herrmann may have been a shoddy draftsman, he did know how to state a claim of defamation when he intended to do so. These fragments of Herrmann's complaint in Suit (4) are insufficient to state a claim for defamation, even under an elastic interpretation.

---

4. Paragraph TWENTY–FIFTH of the complaint reads as follows:

That the defendants did conspire purposefully and intentionally, to deny plaintiff the equal protection privileges and immunities of the laws by firing the plaintiff, and performed acts to humiliate and humble him in order that he would take no actions under his Constitutional rights and the statutes that protect him; further the defendants so conspired because they did not condone plaintiff's advocacy of racial equality and his opposition to the practice of racial discrimination that existed within BROOKLYN LAW SCHOOL; and his support and advocacy of free speech and access to courts and court processes. That such acts and actions as hereinbefore alleged were done solely to deprive the plaintiff of his rights.

5. Paragraph TWENTIETH of the complaint reads as follows:

As a result of the actions and conspiracies on the part of the defendants, the plaintiff has lost his employment and tenure as a Professor

of Law at the BROOKLYN LAW SCHOOL; he has been caused to suffer great mental anguish, strain and embarrassment; his academic freedom has been seriously impaired; his reputation and standing and prestige in the educational community have been severely damaged; his rights to speak out openly in favor of and to advocate racial equality of employment have been seriously impaired; he has lost his property right of employment and tenure; and his pension rights have been seriously impaired and diminished.

6. Paragraphs 61, 68, and 80 of the complaint in Suit (1) read as follows:

61. At the time of such publication defendant Lisle knew or should have known that the statements contained therein were untrue.

68. At the time of such publication defendant Trager knew or should have known that the statements contained therein were untrue.

80. At the time of such publication defendant Yonge knew or should have known that the statements contained therein were untrue.

"Mental Anguish"

The Law School further argues that Paragraphs 20 and 25 of the complaint assert a claim of "mental anguish," citing Section 5.10 of the Umbrella policy as covering this risk. The term "mental anguish" as it appears in the Umbrella policy merely describes a type of damage that results from accidents involving bodily injuries. Each fragment of this passage is not intended to describe a discrete tort covered by the policy. There is no such tort as "shock" or "mental anguish" under New York law. The only related tort that could conceivably apply to the harms Herrmann alleges is "intentional infliction of emotional distress," and the policy does not cover this tort at all. Further, Herrmann's passing reference to "mental anguish" in Paragraphs 20 and 25 is too vague to state an emotional distress claim even if it were covered. *See Ruder & Finn, supra.* Thus Suit (4) not only alleges intentional action outside the definition of "occurrence" in the policies, but also, at best, is too amorphous as to come within any other provisions of the policies.

## CONCLUSION

The relevant facts in this motion for summary judgment are not in dispute. Aetna was not obligated to defend any of the lawsuits brought by Herrmann, nor indemnify for the settlement costs associated with the second and fifth lawsuits. Accordingly, this case is dismissed.

SO ORDERED.