**FREEDOM GRAVEL PRODUCTS, INC., Plaintiff,**

v.

**MICHIGAN MUTUAL INSURANCE COMPANY and its wholly owned subsidiaries, Amerisure Insurance Company, Amerisure Life Insurance Company, Amerisure Incorporated, and Amerisure Re (Bermuda) Ltd., Defendants.**

Civ. No. 91–237C.

United States District Court,
W.D. New York.

April 22, 1993.

Devorsetz Stinziano Gilberti & Smith (Eric M. Alderman, of counsel), Syracuse, NY, for plaintiff.

Grosse, Chelus & Herdzik (Jeanne M. Vinal, of counsel), Buffalo, NY, for defendants.

CURTIN, District Judge.

## Background

This case concerns the duty of an insurer to defend and indemnify its insured against a third-party action. The plaintiff, Freedom Gravel ("Freedom"), filed a complaint against the defendants, Michigan Mutual and its wholly owned subsidiaries, Amerisure Insurance Co., Amerisure Life Insurance Co., Amerisure, Inc., and Amerisure Re (Bermuda) Ltd. ("defendants"), alleging breach of contract; negligent, intentional, and malicious denial of the provision of a defense; and unlawful and deceptive actions under New York State General Business Law § 349(a). Plaintiff now moves for partial summary judgment on the issue of defendants' duty to defend, while defendants cross-move for complete summary judgment.

## Facts

Freedom Gravel has operated a gravel mining operation at 10292 Elton Road, Freedom, New York, since 1988. Item 12, Statement of Material Facts, ¶ 1. The mine extracts sand, gravel, and other materials and then prepares the material for sale. Such preparations include: washing, crushing, sorting, and shifting the extractions. Item 2, Memorandum, ¶ 2. At the time Freedom purchased the mine, the previous owner was mixing salt with the sand derived from gravel mining for sale to local municipal agencies. The salt was stockpiled on the property. When the proper amount of sand was produced, it would be mixed in varying ratios with the salt and stored on the property. Freedom was able to continue this practice by purchasing, along with the land, a New York State Department of Environment Conservation ("NYSDEC") mining and processing permit. In 1990, NYSDEC renewed Freedom's permit without limiting or restricting the maintenance of the salt stockpiles. Item 2, Memorandum, ¶ 3.

Kenneth and Donna Miller lived adjacent to Freedom Gravel at 10368 Elton Road. On July 26, 1990, they initiated an action against Freedom ("Miller Complaint" or "underlying action"). Their complaint alleged that sometime between November 1989 and January 1990, Freedom caused substantial quantities of salt, stored near the gravel pit, to wash and drain into the water table. Item 12, Statement of Material Facts, ¶ 2-3. As a result, the Millers claimed their drinking water became contaminated with salt and cyanide, the plumbing in their house was damaged, and they and their children were exposed to sodium chloride, and cyanide. The Millers requested an order of abatement to prevent Freedom from any further mining activities; $1 million for injury to their property and persons; and $5 million in punitive damages. Item 12, Ex. A.

From December 30, 1988, to December 30, 1990, Freedom maintained two Michigan Mutual liability coverage policies: Policy CPP 0339609, a comprehensive General Liability policy; and Policy CU 0335059, an Umbrella Liability policy. Item 15, ¶ 3. Each policy contains a different form of a pollution exclusion clause. The General Liability policy employs a straight exclusion clause, and the Umbrella policy allows "sudden and accidental" pollution to revive coverage. Item 15, Exs. C and D.

Freedom took the proper steps to inform defendants of the underlying claim brought against them. Freedom filed a Notice of Occurrence/Claim with its insurance agent, Mr. Lawrence Digulio, on August 7, 1990. Item 15, ¶ 12, Ex. E. Freedom's attorneys notified Mr. Digulio on August 10, 1990, that they would represent Freedom in the action brought by the Millers. Mr. Digulio sent both the notice of occurrence and the letter to Amerisure Insurance. *Id.*

In a letter to Freedom dated August 28, 1990, Michigan Mutual advised plaintiff that it was the carrier for both the General Liability and Umbrella policies. Michigan further informed Freedom that any loss from the Miller action was not covered under the policies. Michigan's senior claims adjustor, Mr.

Harry J. Frizzell, cited the pollution exclusion clause in the General Liability policy as the reason for the denial of coverage. Item 15, ¶ 14, Ex. F. The letter failed to identify any clause in the Umbrella policy which would exclude coverage of the Miller action.

Upon Michigan Mutual's refusal to defend Freedom on the grounds of a noncovered event, Freedom hired the law firm of Devorsetz, Stinziano & Smith to represent it in the underlying action. Item 12, Alderman Aff., ¶ 8. Freedom obtained a stipulation of discontinuance from the Millers on April 3, 1991. Item 12, Alderman Aff., ¶ 10. In return, Freedom purchased the Millers' property for $52,000 and made a cash payment of $33,000 for all past, present and future expenses and damages allegedly suffered by the Millers and their children. Item 12, Statement of Material Facts, ¶ 9.

Freedom commenced this action on April 2, 1991, alleging that defendants breached their duties under the insurance contract; that defendants negligently, intentionally, and maliciously refused to defend the plaintiff; and that they engaged in unlawful and deceptive acts under N.Y.Gen.Bus.Law § 349(a). Item 1, Compl.

Defendants readily admit that Freedom held the General Liability and Umbrella insurance policies through Michigan Mutual continuously from December 30, 1988, to December 30, 1990. Defendants also admit that Michigan Mutual denied coverage under the General Liability policy. Defendants raise, as a separate defense, that since Amerisure Insurance Co., Amerisure Inc., and Amerisure Re (Bermuda) Ltd. were not named on any insurance contract held by Freedom, Freedom is precluded from alleging a cause of action against any defendant but Michigan Mutual.

### Discussion

At the outset, it is important to note that Freedom purchased the two liability insurance policies at issue from defendant Michigan Mutual, the parent company of the various defendant Amerisure wholly owned subsidiaries. No contract of insurance was purchased from the various Amerisure entities listed as defendants in the complaint. Plaintiff was advised by the Superintendent of Insurance that Amerisure, Inc., and Amerisure Re (Bermuda) Ltd. are not authorized to do business in New York. Item 15 at 4 and Ex. I. Moreover, the Superintendent of Insurance never received an acknowledgement of service in regard to Amerisure Life Insurance Company. *Id.* at 5. Plaintiff does not challenge this, therefore, for failure to state a claim, the Amerisure entities are dismissed. Any other reference to defendant in this order will apply only to Michigan Mutual.

Plaintiff's motion seeks partial summary judgment under Fed.R.Civ.P. 56(a) on the ground that defendants owed plaintiff a duty to defend. Defendants cross-move for complete summary judgment on the grounds of not having any duty to defend nor indemnify plaintiff.

As to a motion for summary judgment, it will be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). *See generally, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement 'is that there be no *genuine* issue of *material* fact.'" *Olin Corp. v. Insurance Co. of North America,* 762 F.Supp. 548, 557 (S.D.N.Y.1991) *quoting Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). Moreover, use of the summary judgment vehicle is particularly appropriate in the resolution of insurance contract coverage disputes. *McGinniss v. Employers Reins. Corp.,* 648 F.Supp. 1263, 1266 (S.D.N.Y.1986).

It is undisputed that Freedom purchased the General and Umbrella Liability insurance policies from defendant which were effective during the period covering December 30, 1980 through December 30, 1990. It is also

undisputed that the allegations of the underlying complaint set out an "occurrence" during the period of policy coverage.

The nature of the two liability policies is such that the Umbrella Liability policy acts as an excess liability policy for claims exceeding the $1 million-per-occurrence, two-occurrence-cap limits. The motions before this court require the interpretation of several of the policies' clauses commonly included in commercial insurance policies: the pollution exclusion clause and those clauses which "trigger" coverage under the Umbrella Liability policy.

Each policy contains a clause known as a "pollution exclusion." The General Liability policy's blanket pollution exclusion is without exception and very broad:

"This insurance does not apply to:

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises you own, rent or occupy;

. . . . .

(d) At or from any site or location on which you or any contractors or subcontractors working directly on your behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; ...

. . . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

Item 12, Ex. B, § 1, ¶ 2.

The excess Umbrella Liability policy also contains a pollution exclusion clause, but provides for revival of coverage through a limited exception for sudden and accidental releases of pollutants:

This policy does not apply:

No. 9. [T]o bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

. . .

Item 12, Ex. C., Exclusions ¶ 9.

Plaintiff contends that defendant Michigan Mutual based its refusal to defend plaintiff Freedom solely upon the pollution exclusion language of the Umbrella Liability policy. Item 12 at 8. In fact, this is incorrect. Defendant Michigan Mutual based its denial of coverage and concomitant refusal to defend on the pollution exclusion language of the General Liability policy, which contains no exceptions permitting revival of coverage. Item 12, Ex. E. In its later submissions, plaintiff argues that defendant, by basing its denial of coverage solely on the General Liability policy, failed to review applicable coverage under the excess Umbrella Liability policy to determine if a duty to defend existed.

Defendant argues that the excess Umbrella Liability policy is inapplicable for two reasons. First, the total amount of the claim is far less than the $1 million-per-occurrence General Liability policy limit. Second, the cause of the contamination was a seepage of contaminants over a three-month period, which does not constitute a sudden and accidental occurrence. Item 19 at 2.

Plaintiff does not contend that its claim would have been ultimately covered by either policy. Plaintiff's present motion for partial summary judgment is directed foremost at the threshold question of defendant's duty to defend it against the Millers' underlying suit against Freedom. Plaintiff and defendant generally agree that the General Liability policy's blanket pollution exclusion negates both the availability of coverage and the duty to defend under that policy. However, plaintiff argues that defendant, at least, had a duty to defend under the Umbrella Liability policy upon Michigan Mutual's receipt of the Miller complaint.

■ Under New York law, the determination of the duty to defend is a question of law for the court. *National Grange Mutual Ins. v. Continental Casualty Ins.*, 650 F.Supp. 1404, 1408 (S.D.N.Y.1986); *see also Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984). New York courts have consistently recognized that "the insurer's duty to furnish a defense is broader than its obligation to indemnify." *Gillette*, 486 N.Y.S.2d at 876, 476 N.E.2d at 275. "If the complaint contains any facts or allegations which bring the claim even potentially within the protections purchased, the insurer is obligated to defend." *Technicon Elecs. v. American Home Assurance ("Technicon II")*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 533, 542 N.E.2d 1048, 1050 (Ct.App.1989); *see also Gillette*, 486 N.Y.S.2d at 876, 476 N.E.2d at 275, and *Ruder & Finn v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 861, 422 N.E.2d 518, 521 (Ct. App.1981). Thus, the insurer is required to provide a defense to any action, however groundless, in which there exists any possibility that the insured might be held liable for damages where facts are alleged within the coverage of the policy. *See National Grange*, 650 F.Supp. at 1407–08. Indeed, New York courts have viewed liability insurance as "litigation insurance". *Gillette*, 486 N.Y.S.2d at 876, 476 N.E.2d at 275; *National Grange*, 650 F.Supp. at 1407.

■ There is no duty to defend, however, if the insurer shows that the allegations in the complaint fall completely within the policy exclusions and the allegations as a whole are subject to no other interpretation. *Technicon II*, 544 N.Y.S.2d at 533, 542 N.E.2d at 1050; *International Paper Co. v. Continental Casualty Co.*, 35 N.Y.2d 322, 361 N.Y.S.2d 873, 875, 320 N.E.2d 619, 620 (Ct.App.1974). The insurer, however, bears the heavy burden of proving to the court that, as a matter of law, there is no possible basis in law or fact upon which the insurer might be held to defend. *Savoy Medical Supply Co., Inc. v. F & H Mfg. Corp.*, 776 F.Supp. 703 (E.D.N.Y. 1991), citing *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir.1989), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

The applicable Umbrella Liability policy provisions which trigger defendant's duty to defend Freedom against the Miller suit is found in clauses 2(a) and 2(b) as follows:

2. DEFENSE, SUPPLEMENTARY PAYMENTS

a) With respect to any claim or suit alleging bodily injury, property damage, personal injury, or advertising injury which is not covered by the underlying policies listed in the Schedule of Underlying Insurance attached to the policy or any applicable insurance, but which is covered by the terms and conditions of this policy, except for the self-insured retention specified in Item 3(c) of the declarations, or

b) with respect to any claim or suit alleging bodily injury, property damage, personal injury, or advertising injury covered by this policy which the underlying insurer has no further duty to defend, due to exhaustion of any underlying limits of liability or aggregate limits of liability by reason of any losses paid thereunder, . . . .

Item 12, Ex. C.

Section 2(1) of the Umbrella Policy describes what the duty to defend entails once it is triggered by clause 2(a) or, in the alternative, clause 2(b):

The Company shall:

(1) defend any suit against the insured brought within the United States of America, its territories or possessions, or Canada seeking damages on account of such bodily injury, property damage, personal injury, or advertising injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient. . . .

Item 12, Ex. C.

■ An insurer's duty to defend and indemnify its insured depends upon the allegations set forth in the underlying complaint as considered in light of the governing policy provisions. *State of New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1426 (2d Cir. 1991). Essentially, for defendant's duty to

defend to arise in accordance with paragraph 2(a) of the Umbrella Liability policy, the Miller complaint must present a claim that alleges, among other things, property damage which lies outside the coverage provided by any other applicable insurance which, in turn, must be covered by the terms and conditions of the Umbrella Liability policy. The self-insurance element is not an issue in this case.

The Miller complaint, in fact, alleges property damage in the amount of $1 million. Item 12, Ex. A at 5, ¶ 2. The Millers' alleged property damage lies outside the coverage of the General Liability policy, Freedom's only other applicable insurance, for the very reason that Mutual itself denied the claim as being outside the coverages afforded by the General Liability policy. This would meet the relevant requirement of paragraph 2(a). Item 12, Ex. E. Since the court finds that this requirement is met under paragraph 2(a), it need not further consider the alternate trigger found in paragraph 2(b) which relies on the exhaustion of the underlying General Liability limits on liability. However, the court notes that there is some authority tending to support the proposition that costs incurred under compulsion of law to carry out abatement are recoverable, and therefore should be counted against the total underlying policy limits under paragraph 2(b), for example. *See, e.g., Broadwell Realty Services v. Fidelity and Casualty Co. of New York*, 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987); *Consolidated Rail Corp. v. Certain Underwriters at Lloyd's*, No. 84–22609, 1986 WL 6547 (E.D.Pa. June 3, 1986). *See also Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394 (D.N.J. 1987).

The only remaining issue relative of defendant's duty to defend under either paragraph 2(a) or paragraph 2(b) is dependent on whether the Miller complaint contains any facts or allegations that arguably or potentially bring the action within the protection purchased, or that would support a reasonable possibility that coverage exists under the Umbrella Liability policy. *See United States v. AMRO Realty Corp.*, 806 F.Supp. 349, 354 (N.D.N.Y.1992) (citations omitted);

*see also Technicon II*, 544 N.Y.S.2d at 533, 542 N.E.2d at 1050. This issue, in turn, is influenced by the revival clause in the Umbrella Liability policy's pollution exclusion. Thus, the dispositive question is whether there is a reasonable possibility that Freedom's claim, constituting the Millers' allegations of Freedom's discharge of salt and chemical contaminants into their potable water, arose from a "sudden and accidental" occurrence. *See New York v. AMRO Realty Corp.*, 936 F.2d at 1427. The relevant Miller allegations on this point, include:

7. In or about the months of November, 1989, December, 1989, and January, 1990 Defendant did store and stockpile road salt (sodium chloride) at the site of the above-mentioned gravel pit.

9. During the aforesaid period of time, Defendant, through the acts of its employees, agents, and/or contractors, caused substantial quantities of salt from said stockpiles of salt stored in and adjacent to the gravel pit to wash and drain into and onto the earth and to migrate into the groundwater table and to flow substantial distances over the gravel pit floor by ditches and channels and as surface water runoff into a sedimentation basin located in the gravel pit and excavated into the water table.

12. During the period of time Defendant conducted the activities complained of above, and at all times subsequent thereto, Plaintiffs' well water became contaminated with salt, gradually acquiring an increasingly unpleasant and pronounced salty taste until it became objectionable to drink.

20. Upon information and belief, large quantities of salt, contaminated soil and contaminated water remain on Defendant's real property that will cause or are likely to cause continued and further pollution of Plaintiffs' real property.

Item 12, Ex. A.

Since the "sudden and accidental" exception to the pollution exclusion is expressed in the conjunctive, both requirements must be satisfied for the exception to become operative and defendant's duty to defend to materialize. *Ogden Corp. v. Travelers Indem.*

*Co.*, 924 F.2d 39, 42 (2d Cir.1991). "[I]f the discharge is either non-sudden or non-accidental, there will be no coverage." *New York v. AMRO Realty Corp.*, 936 F.2d at 1427. In determining the scope of policy exclusions, the traditional rule is that any ambiguity will be construed against the insurer and in favor of the insured. *Thomas J. Lipton, Inc. v. Liberty Mutual Ins. Co.*, 34 N.Y.2d 356, 357 N.Y.S.2d 705, 708, 314 N.E.2d 37, 39 (Ct.App.1974). However, this rule of construction applies only if there is a latent ambiguity in the language of the exclusion. If the language of the exclusion is clear, this rule need not be applied for "[i]t must not become an overarching policy determination justifying the use of tortured logic to find ambiguity where in fact none exists." *U.S. Fidelity and Guar. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33 (6th Cir. 1988).

"Under New York law, the word "sudden" implies a temporal element." *Olin Corp.*, 762 F.Supp. at 560 (citations omitted). In fact, "[f]or a release or discharge to be sudden, it must 'occur[ ] over a short period of time.'" *Ogden*, 924 F.2d at 42, citing *Technicon Elecs. v. American Home Assurance, Co. (Technicon I)*, 141 A.D.2d 124, 533 N.Y.S.2d 91, 99 (2d Dep't 1988). Thus, an event lasting for an extended period of time is not sudden, and New York's interpretation comports with the word's meaning in everyday usage. *Olin Corp.*, 762 F.Supp. at 560.

Freedom contends that, to the extent that the allegations of the Miller complaint do not clearly negate the possibility that the initial discharge or escape was sudden and accidental, Michigan Mutual had a duty to defend. *See Colonial Tanning Corp. v. Home Indem. Co.*, 780 F.Supp. 906, 921 (N.D.N.Y.1991), citing *Avondale*, 887 F.2d at 1205. In effect, with its reliance on *Colonial Tanning* and *Avondale*, Freedom maintains that there always remains the possibility of potential coverage, when not otherwise explicitly alleged, that the discharge into the Millers' potable water supply was sudden and accidental. This court cannot agree under the circumstances of this case. Such an interpretation would all but nullify the "sudden and accidental" exception.

Plaintiff seeks to have this court interpret the allegations of the Miller complaint to allege an accidental and unexpected leak from the stockpile of salt that continued undetected for a period of time as an event both sudden and accidental within the meaning of Michigan Mutual's policy. However, the complaint does not even hint at any event that would have caused such a sudden occurrence, and we should "decline to obligate an insurer to extend coverage based on a reading of the complaint which is linguistically conceivable but tortured and unreasonable." *New York v. AMRO Realty*, 936 F.2d at 1428.

Plaintiff's reliance on *Avondale*, in the "suddenness" context, is inapposite to the extent that the court there discussed allegations in terms of their being "accidental," an issue this court is not required to reach since it finds the underlying complaint to allege a non-sudden occurrence. Unlike the complaint involved in *Colonial Tanning*, 780 F.Supp. at 921, a review of the relevant portions of the Miller complaint reveals that it is not completely silent as to when the alleged contamination started or ended. In fact, the Millers specifically alleged a three-month time period "during" which the contamination of their water is said to have occurred. Item 12, Ex. A at ¶ 10. It is further alleged that the presence of the salt and associated pollution constituted the likelihood of "continued" pollution of the Millers' property. *Id.* at ¶ 20. The phrases "during" and "continued" do not, as alleged, ordinarily lend themselves to an interpretation of suddenness.

Since the allegations of the complaint do not comport with an objective determination of suddenness, there is no need to consider whether the Miller complaint alleges an accidental discharge. *Ogden Corp.*, 924 F.2d at 42. However, in its review of the complaint, the court does not find the allegations to advance a theory of an "accidental" discharge either.

New York decisional law defines "accidental" to mean "unintended" or "unexpected." *Olin Corp.*, 762 F.Supp. at 561 (citations omitted). The focus of the inquiry is upon whether the discharge of the pollutant, as

opposed to the resultant damage, was unintentional or unexpected. *Id.* In other words, the contamination of the Millers' property could be accidental only when the conduct resulting in pollution, *i.e.*, the resultant runoff and drainage from the storing and mixing of salt, was unintended. *See Ogden*, 924 F.2d at 42.

Moreover, the benefit of the sudden and accidental exclusion is unavailing where the underlying complaint explicitly alleges the discharge or release of pollutants to be intentional and deliberate. *See New York v. AMRO Realty Corp.*, 936 F.2d at 1427. However, in their complaint, the Millers advance alternative counts of negligent and intentional pollution. Item 12, Ex. A at ¶¶ 15 & 24. Thus, in terms of being "accidental," the first count would generally be within coverage and the second count outside coverage. However, the joining of causes of action that are within coverage with causes of action that are outside coverage does not defeat the insurer's broader duty to defend the entire action.

The Miller complaint clearly alleges the circumstances of the contamination—who caused it, when, and how it occurred. Moreover, the complaint also alleges that Freedom intended both the storage and mixture of the salt deposits, and caused salt water runoff. It matters not, under New York law, that Freedom neither expected nor intended its salt-mixing activities to result in pollution damage to another property. The Millers, obviously, do not allege in their negligence action that Freedom intentionally contaminated their property. It is sufficient that the Millers do claim that Freedom's salt storage and mixing operation "caused substantial quantities of salt ... to drain into and onto the earth and to migrate into the groundwater table ..." during a specific three-month period. It is also apparent that Freedom expected such runoff and drainage since there was a series of channels and ditches leading to a sedimentation basin excavated into the water table. Item 12, Ex. A at ¶ 9. *See Technicon I*, 533 N.Y.S.2d at 99.

Thus, the court cannot find the allegations of the complaint to support a finding of either a sudden or accidental discharge of pol-

lution. As a result, the pollution clause of the Umbrella Liability policy governs without the benefit of exception, defeating the triggering requirements of paragraph 2(a). Item 12, Ex. C. Defendant Michigan Mutual has no duty to defend and, therefore, no liability for indemnification since the pollution exclusion applies.

### Conclusion

Accordingly, complete summary judgment is granted to defendant on the issues of indemnification and its duty to defend. Plaintiff's motion for summary judgment is denied. *The complaint is dismissed in its entirety.*

So ordered.