**OLIN CORPORATION, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

No. 84 Civ. 1968 (LBS).

United States District Court, S.D. New York.

April 23, 1991.

Haythe & Curley, New York City (Michael L. Gioia, James J. Harrington, Russell K. Statman, of counsel), Anderson, Kill, Olick & Oshinsky, P.C., Washington, D.C. (Sherry Gilbert, Jerold Oshinsky, of counsel), for Olin Corp.

Seward & Kissel, New York City (Dale C. Christensen, Jr., R. Scott Garley, Dan F. Laney, III, of counsel), for The Hanover Ins. Co.

Rogers & Wells, New York City (Barry W. Rashkover, Joseph H. Spain, of counsel), for Federal Ins. Co.

Jackson & Campbell, P.C., Washington, D.C. (Richard W. Bryan, James P. Schaller, of counsel), Sheft, Wright & Sweeny, New York City (Leonard Sheft, Peter Sheft, of counsel), Smith, Mazure, Director & Wilkens, New York City (Marvin Fuhrman, Marc H. Pellinger, Stuart Wilkins, of counsel), for Nat. Union Fire Ins. Co. of Pittsburgh (Excess), American Home Assur. Co., Lexington Ins. Co.

Gottesman, Wolgel, Smith & Secunda, P.C., New York City (Lawrence L. Flynn, Harold H. Wolgel, of counsel), for Great American Ins. Co.

Mudge Rose Guthrie Alexander & Ferdon, New York City (Richard Eaton, Paul R. Koepff, of counsel), for Ins. Co. of North America.

Zelle & Larson, San Francisco, Cal. (Steven D. Meier, of counsel), for Employers Ins. of Wausau.

Zelle & Larson, Minneapolis, Minn. (Michelle K. Enright, Paul L. Gingras, Pat St. Peter, of counsel), Kroll & Tract, New York City (Jerome Murray, of counsel), for Employers Ins. of Wausau.

Gilberg & Kurent, Washington, D.C. (K. Thomas Shahriari, of counsel), Levy, Bivona & Cohen, New York City (Howard Epstein, of counsel), for Fireman's Fund Ins. Co.

Bromley, Brown & Walsh, Washington, D.C. (James W. Greene, Deborah Warner, of counsel), Bower & Gardner, New York City (Allen G. Katz, Barry G. Saretsky, of counsel), for American Reinsurance Co., Continental Cas. Co., Nat. American Ins.

Co. of California, Northbrook Excess and Surplus Ins. Co.

Locker, Greenberg & Brainin, New York City (Theodore M. Greenberg, Aaron Locker, of counsel), Hopkins & Sutter, Washington, D.C. (Richard H. Gimer, John G. Goodyer, Laura A. Lane, Kathryn A. Underhill, of counsel), for Falcon Ins. Co. and Commercial Union Ins. Co.

Hamel & Park, Washington, D.C. (Richard Gimer, Stephen L. Humphrey, of counsel), for Commercial Union Ins. Co.

Hansel & Post, Atlanta, Ga. (G. Lee Garrett, Jr., of counsel), for Witness Benton H. Wilcoxon.

McCullough, Campbell & Lane, Chicago, Ill. (Richard J. Geddes, of counsel), Condon & Forsythe, New York City (Thomas J. Whalen, Michael Holland, of counsel), for certain underwriters at Lloyd's, London North River Ins. Co., London & Edinburgh Ins. Co., Ltd.

## OPINION

SAND, District Judge.

Faced with a rising tide of lawsuits stemming from the alleged chemical contamination of the areas surrounding a number of its chemical plants, the Olin Corporation ("Olin") filed suit in 1984 against its primary and excess liability insurance carriers, seeking a declaration that they were obligated to defend and indemnify in the underlying lawsuits. Now, after seven years of discovery and motion practice, the case again comes before this Court.[1] Presently at issue are motions for partial summary judgment by fourteen of Olin's primary and excess insurers. These motions relate to the insurers' duty to defend and indemnify Olin for losses stemming from alleged dichlorodiphenyltrichloroethane ("DDT") contamination in areas near Olin's Huntsville, Alabama plant ("Huntsville plant").

Defendant Employers Insurance of Wausau ("Wausau"), a primary insurer, moves for partial summary judgment on the ground that a so-called "pollution exclusion" clause in its policies with Olin absolves it of any obligation to defend or indemnify Olin. Twelve excess liability carriers[2] (collectively, "the Excess Insurers") also move for partial summary judgment. They claim that they have no obligation to indemnify on the grounds that there was no "occurrence" within the meaning of their policies with Olin, and that in any event at least part of their liability is absolved by the pollution exclusion clauses in their policies. Defendant Hanover Insurance Company ("Hanover"), a primary insurer, moves for judgment on the occurrence issue and on the additional ground that Olin did not notify it of the alleged Huntsville occurrence in a timely fashion.

For the reasons given below, Wausau's motion for summary judgment is granted. The motions of the Excess Insurers are granted to the extent they are based on the pollution exclusion clause issue, but denied insofar as they are based on the occurrence issue. Hanover's motion is granted on the late notice issue.

## I. BACKGROUND

In 1954, Olin purchased the Calabama Chemical Company ("Calabama"), which operated a manufacturing plant near Huntsville, Alabama. The plant, which produced industrial-grade DDT for commercial use, was located on land owned by the United States Army in an area known

---

1. This Court has issued five previous opinions in this case. *See Olin Corp. v. Insurance Co. of N. Am. (INA)*, 743 F.Supp. 1044 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir.1991); *Olin Corp. v. INA*, No. 84–1968, slip op. (S.D.N.Y. Dec. 30, 1986); *Olin Corp. v. INA*, No. 84–1968, slip op. (S.D.N.Y. Dec. 19, 1986); *Olin Corp. v. INA*, 607 F.Supp. 1377 (S.D.N.Y.1985); and *Olin Corp. v. INA*, 603 F.Supp. 445 (S.D.N.Y.1985).

2. The twelve excess insurance carriers are: American Home Insurance Company, American Reinsurance Company, Commercial Union Insurance Company, Continental Casualty Company (CNA), Falcon Insurance Company, Federal Insurance Company, Fireman's Fund Insurance Company, Great American Insurance Company, Lexington Insurance Company, National American Insurance Company, National Union Insurance Company, and Northbrook Insurance Company.

as the Redstone Arsenal.[3] Calabama had leased the plant and the surrounding land from the Army, and Olin assumed the lease when it bought Calabama. Benton Wilcoxin, a member of the partnership that owned Calabama, continued on as the manager of the plant after the Olin acquisition.

Olin manufactured DDT at the Huntsville plant from 1954 until 1970, at which time Olin voluntarily ceased operations there. During much of that time the plant operated on a continuous seven day a week schedule, producing one to two million pounds of industrial-grade DDT per month.

## A. The DDT Manufacturing Process

The DDT manufacturing process at the Huntsville plant began with the manufacture of a chemical called chloral. After being created through a chemical reaction, the chloral was purified through a process which produced two byproducts, sulfuric acid and sodium hypochlorite (bleach). After being purified, the chloral was rinsed with water in a process which resulted in the creation of a third byproduct, hydrochloric acid. The three byproducts—sulfuric acid, bleach and hydrochloric acid—were released into waste water trenches running alongside the plant which eventually led into a creek known as the Huntsville Spring Branch. *See* Deposition of Benton H. Wilcoxin, Ex. 1 to Cover affidavit ("Wilcoxin Dep. I"), pp. 46–57.

After manufacturing the chloral, Olin started the process of making DDT. DDT was made by mixing the chloral with monochlorobenzene ("MCB") in a process which created molten DDT. The molten DDT was then subjected to three "washings" in water solutions. After the washings, the process water also was released into the waste water trenches. *See id.* at 58–72.

The molten DDT was then placed into a "steam stripper" which used steam to remove any remaining MCB from the DDT. After being stripped, the molten DDT was allowed to cool and solidify. The steam, now laced with MCB, condensed into a liquid with two layers, a layer of process water and a heavier layer of MCB. The MCB layer was transferred to a storage tank for reuse and the process water was dumped into the waste water trenches. *See id.* at 70–71.

As described above, the DDT manufacturing process involved the release of process waters and three byproducts (collectively, the "effluent"). The effluent was expelled into brick-lined waste water trenches running alongside the plant. The trenches carried the effluent 50 to 75 feet south of the plant to a 200 foot long drainage ditch. At the end of the drainage ditch the effluent flowed into an acid-neutralization pit and then flowed through a three-quarter mile long drainage ditch which emptied into the Huntsville Spring Branch. *See* Deposition of Donald E. Morgan, Ex. 2 to Cover affidavit, pp. 49–56.

## B. Discharge of DDT from the Huntsville Plant

According to Olin, it believed that the Huntsville plant was a "closed" plant—that is, "a plant which did not, as part of its regular operations, allow its product, DDT, to escape into the effluent or waterways." Memorandum of Law of Olin Corporation in Opposition to Wausau's Motion for Partial Summary Judgment ("Olin's Memorandum of Law"), p. 16. However, the undisputed facts show that DDT was escaping from the plant on a more or less continuous basis during the sixteen years Olin operated the plant. In 1965, when Olin installed a "settling tank" through which the effluent passed, the tank filled up with 12,000 pounds of DDT-bearing material in four months. *See* United States Army Preliminary Sanitary Engineering Survey, Ex. 8 to Gimer affidavit ("Army Sanitary Survey Report"), p. 9. On the basis of this event, it is clear that substantial quantities of DDT were leaving the plant during the entire period of its operation.

The documents and affidavits submitted by the parties demonstrate that executives

---

**3.** The plant formerly had been used by the Army to produce mustard gas and other chemical weapons.

at the Huntsville plant were on notice that DDT was escaping from the plant even before Olin assumed operations there. During the sixteen years that Olin operated the plant, the evidence of DDT release and DDT contamination continued to mount.

As early as 1948, Mr. Benton Wilcoxin, the plant manager, knew that some DDT was escaping from the plant. At that time, Wilcoxin saw DDT in the waste water ditches running alongside the plant. Deposition of Benton H. Wilcoxin, Ex. 1 to Gimer affidavit ("Wilcoxin Dep. II"), p. 1.

By 1952 the United States Army, which owned the land on which the plant was situated, had become concerned about chemical discharges from the Olin plant. On June 23, 1952, Niles Prestage, the Army Chief of Utilities at the Redstone Arsenal, wrote a memorandum in which he set a maximum limit of DDT in Olin's effluent at 10 ppm (parts per million). He also established the permissible level of DDT in the Huntsville Spring Branch, into which the drainage ditch emptied, as "none". *See* Memorandum of Niles Prestage, Ex. 32 to Gimer affidavit, p. 1.

In 1955 two engineers, Donald Morgan and Thomas Trapane, were assigned to the Huntsville plant by Olin. Their duties included the task of monitoring the discharge of waste water from the plant. When the two arrived at the plant in 1955, they observed DDT in the waste water trenches near the plant. Deposition of Donald E. Morgan, Ex. 11 to Gimer affidavit ("Morgan Dep."), pp. 14, 102. Trapane began analyzing the plant effluent on a daily basis. He determined that small concentrations of DDT were present in the effluent due to the ordinary operations of the plant. Deposition of Thomas Trapane, Ex. 40 to Gimer affidavit ("Trapane Dep."), p. 115.

During the mid–1950s, a body of scientific literature began to develop concerning the possible dangers of DDT to the environment and to humans. Olin executives at the Huntsville plant were familiar with this literature, although they disagreed

that DDT was dangerous.[4] *See id.* at 71–72.

In 1957, the Army hired a chemist named Jimmie Reid to work in the Sanitation Section at the Redstone Arsenal. His duties included monitoring the operations of Olin and other companies located on the Redstone Arsenal property. Reid began monitoring the effluent from the Olin plant in 1957. At that time he noticed white material, "which appeared to be DDT," on the bottom of Olin's waste water ditches. Deposition of Jimmie G. Reid, Ex. 28 to Gimer affidavit ("Reid Dep. I"), pp. 9–10; *see also* Deposition of Jimmie G. Reid, Ex. 44 to Gimer affidavit ("Reid Dep. II"), p. 33. A sample of the material was sent to a NASA laboratory for analysis, where it was determined to be DDT. *See* Deposition of Knowlen F. Knowles, Ex. 45 to Gimer affidavit, p. 11.

In 1961, Reid inspected the drainage ditch leaving the Olin plant. He observed DDT in the ditch. He also observed a delta of white material, which appeared to be DDT, at the confluence of the Olin drainage ditch and the Huntsville Spring Branch. Deposition of Jimmie G. Reid, Ex. 43 to Gimer affidavit ("Reid Dep. III"), pp. 224–25. Reid later tested the white material and confirmed that it was DDT. On instructions from his supervisor at the Redstone Arsenal, Reid took pictures of the DDT deposits in the drainage ditch and in the Huntsville Spring Branch. Reid showed these photos to Mr. Wilcoxin, the Olin plant manager, but Wilcoxin took no action to determine how much DDT was in the Huntsville Spring Branch. *See* Reid Dep. I at 44; Wilcoxin Dep. II at 330–31.

During the period 1962–63, concern about the potentially harmful effects of DDT grew in the scientific community and among the public at large. Rachel Carson's book *Silent Spring*, which made serious allegations regarding the harmful effects of DDT on wildlife and humans, was published in 1962. In 1963, an official of the National Cancer Institute testified in a

4. However, during the period 1957–1958 Olin began putting cautionary labels on some of its DDT products which warned that the products should not be used near children, fish or wild fowl. *See* Deposition of Morton Bader, Ex. 15 to Gimer affidavit, pp. 115, 124–26.

Senate hearing that DDT was carcinogenic. *See* Testimony of Dr. Hueper, Ex. 51 to Gimer affidavit, p. 34. Management personnel at Olin were aware of these developments. *See* Deposition of Richard Henderson, Ex. 19 to Gimer affidavit, p. 182; Deposition of Leonard A. Krause, Ex. 52 to Gimer affidavit, pp. 73–76, 83.

In August, 1963, Jimmie Reid again visited the Olin plant. He observed a DDT "bar" at the confluence of the Olin drainage ditch and the Huntsville Spring Branch. *See* Reid Dep. I at 64. He also observed DDT some two hundred feet downstream. In addition, Reid noticed "an extensive DDT build-up along the lower bank" of the Branch. *Id.* at 49. Reid's observations were reported to Olin's management at the Huntsville plant. *See id.* at 71–72. Reid, concerned about the possible DDT contamination of the Branch, recommended that the United States Public Health Service ("Health Service") become involved. *See id.* at 90.

The Health Service visited the Olin plant in the fall of 1963. Concern within the Health Service grew when it was discovered that traces of DDT were found at a dam more than 100 miles downstream from the Olin plant. *See* Deposition of Billy G. Isom, Ex. 61 to Gimer affidavit, p. 56. The Health Service issued a report on the Redstone Arsenal area in late 1963. The report found that Olin's effluent contained DDT. The report also noted that the Huntsville Spring Branch was substantially polluted, resulting in fish kills. Toxicity studies contained in the report showed that all fish exposed to a 25% concentration of Olin's effluent were killed within an hour of exposure. *See* Health Service Preliminary Report, Ex. 65 to Gimer affidavit, pp. 1, 8. In a subsequently issued report, the Health Service concluded that wastes from the Olin plant contained "toxic concentrations of DDT...." Health Service Interim Report, Ex. 7 to Gimer affidavit, p. 10. On March 26, 1964, Wilcoxin and another Olin executive attended a meeting in Atlanta called by the Health Service. At the conference, a Health Service official summarized the results of the 1963 Health Service report and described the Service's concerns

about the effect of DDT on fish and wildlife, and on members of the public who might consume affected fish or wildlife, such as squirrels or waterfowl. *See* Wilcoxin Dep. II at 377; *see also* Conference Summary Report, Ex. 70 to Gimer affidavit, pp. 2–5.

At about this time, the Army sent a warning letter to Olin's legal department regarding the pollution situation at the Huntsville plant. The Army's lease with Olin provided that Olin was forbidden from "discharg[ing] waste or effluent from the Leased Property in such a manner that such discharge will contaminate streams or other bodies of water or otherwise become a public nuisance." *See* Memorandum of V.H. Hartmann, Ex. 129 to Gimer affidavit, p. 1. In its letter, the Army advised Olin that its continued discharge of hazardous waste might constitute a violation of the lease.

In May, 1964, the Army again wrote to Olin. This letter, addressed to Wilcoxin, proposed a limit of 80 ppb (parts per billion) with respect to the DDT in Olin's effluent. *See* Letter of United States Army (5/15/64), Ex. 73 to Gimer affidavit, pp. 1–4. Wilcoxin responded with a letter in which he stated that "the most serious area, with respect to pollution, is that of DDT concentration." Wilcoxin Letter (5/22/64), Ex. 74 to Gimer affidavit, p. 1. Olin management began planning methods to reduce the DDT problem, including the installation of a "settling tank" between the waste water trenches and the drainage ditch, the purpose of which would be to permit the DDT to settle out of the effluent before it reached the Huntsville Spring Branch. *See* Morgan Letter (7/8/64), Ex. 10 to Gimer affidavit, p. 2.

On July 11, 1964, the Olin plant was shut down temporarily to permit the construction of the settling tank. While construction was underway, the Tennessee Valley Authority ("TVA") completed a study which showed that the Huntsville Spring Branch was "highly polluted with DDT." Deposition of Charles Davidson, Ex. 64 to Gimer affidavit, pp. 70–71. Construction of the settling tank was completed on January

8, 1965. The tank was large, measuring eight feet wide, thirty-two feet long and eight feet deep. From the tank, the plant effluent flowed into the plant's drainage ditch and then onward to the Huntsville Spring Branch. After the tank was completed, Olin reopened the plant but operated it at only 50% of capacity. *See* Morgan Dep. at 267.

Despite the addition of the settling tank, Olin's effluent exceeded the 80 ppb limitation on many occasions. *See* Olin Letter (5/18/65), Ex. 88 to Gimer affidavit, pp. 1–2. When a team of Army inspectors visited the Olin plant in September, 1965, they noticed that the settling tank was "completely filled with DDT solids." Army Sanitary Survey Report at 9. Plant personnel estimated that there were more than 12,000 pounds of DDT solids in the tank, which had been cleaned approximately four months before. *Id.* When a specialist from Olin visited the Huntsville plant three months later, in December, 1965, he also found that "the tank area and the area around it looked as though the DDT solids had overrun the tank." Memorandum of Louis Rozmay, Ex. 100 to Gimer affidavit, p. 1.

On December 14, 1965, a meeting was held between an official of the Army Corps of Engineers and Olin personnel, including Wilcoxin. At that meeting the Army set a limit of 10 ppb of DDT in the Huntsville Spring Branch and retained the 80 ppb limit for the effluent. *See* Wilcoxin Dep. II at 462. In an effort to meet these limits, Olin built a "settling pond" in the drainage ditch area. Completed in approximately May, 1966, the pond was 190 feet long, 20 to 30 feet wide and 9 feet deep. *See* Morgan Dep. at 59–60. Olin also began constructing a new drainage ditch during this period.

On October 26–27, 1967, a conference was held regarding water pollution in the Redstone Arsenal area. Present at the meeting, among others, were Olin representatives and an official from the Federal Water Pollution Control Agency. The official reported that a DDT level of 10 ppb in the Huntsville Spring Branch was danger-

ous to aquatic life and that the limit would have to be reduced. *See* Memorandum (10/30/67), Ex. 10 to Gimer affidavit, p. 1.

Despite Olin's remedial measures, the DDT levels in the plant effluent and in the Huntsville Spring Branch exceeded the applicable limitations on many occasions. *See, e.g.,* Wright Report on Redstone Arsenal, Ex. 113 to Gimer affidavit, p. 1; Wilcoxin Letter (12/12/67), Ex. 114 to Gimer affidavit, p. 1; Report on Waste Disposal Facilities, Ex. 121 to Gimer affidavit, p. 5. The DDT levels in the mud in the drainage ditches and in the Branch were higher still. By May, 1969, the TVA had concluded that "too much DDT [was] still leaving the Redstone Arsenal plant[ ]." Memorandum of Charles Chance, Ex. 124 to Gimer affidavit, p. 1.

In August, 1969, the Army inspected the Olin plant. This inspection led the Army to believe that Olin was in violation of its lease, based upon its emission of DDT and other pollutants. Following the inspection, the Army began procedures to shut down the Olin plant. *See* Summary Report of DDT Contamination, Ex. 9 to Gimer affidavit ("DDT Summary Report"), p. 3; Letter of General McBride (9/5/69), Ex. 127 to Gimer affidavit, p. 1. When the plant was closed for maintenance on August 18, 1969, the Army informed Olin that it would not be permitted to reopen the plant until more effective pollution controls were in place. *See id.*

Olin subsequently established additional pollution control measures at the plant, including improved settling ponds and the installation of a carbon filter system. *See* Letter of V.H. Hartmann (11/4/69), Ex. 134 to Gimer affidavit, pp. 1–2. On January 10, 1970, the plant reopened. Despite the presence of the additional controls, DDT levels in the effluent and in the Huntsville Spring Branch continued to exceed the limits established by the Army. *See* Letter of Kenneth Knapp (1/20/70), Ex. 136 to Gimer affidavit, pp. 3–4; Deposition of David Delavan, Ex. 109 to Gimer affidavit, p. 89.

On May 12, 1970, Olin determined that it would get out of the DDT business and

close the Huntsville plant. The plant was closed on June 30, 1970. On December 30, 1970, the government banned all use of DDT except in certain emergency cases of crop infestation. *See* DDT Summary Report at 4. The Army demolished the Huntsville plant in early 1972.

In April, 1972, the Army conducted a water quality survey in the areas surrounding the Olin plant site. The study showed extensive land and water contamination with DDT. *See id.* at 6. An analysis of fish in the waters surrounding the old plant site revealed DDT levels in excess of Food and Drug Administration limits. *Id.* Based on these findings, the Environmental Protection Agency ("EPA") authorized the Army to clean up the plant site. *Id.* at 7.

In 1978, the TVA conducted a study of the extent of DDT contamination downstream from the Redstone Arsenal and produced a report, at the request of the EPA. The report found high levels of DDT in fish in the waters downstream from the old Olin plant. The report also expressed concern about the possible effects of DDT on persons who ate the contaminated fish. *See* TVA Report, Ex. 144 to Gimer affidavit, pp. 1, 6.

The TVA report was released to the public in late 1978. The following year the Center for Disease Control conducted a study of the residents of Triana, Alabama, a town located downstream from the Olin plant. The study showed unusually high concentrations of DDT in the blood serum of Triana residents. Blood serum levels of DDT were positively correlated with high fish consumption. *See* DDT Summary Report at 9–10.

On July 9, 1979, thirty-two persons representing a portion of the commercial fishing industry filed suit against Olin. *See* Gimer affidavit, ¶ 220. Fourteen other lawsuits subsequently were filed by individuals and government entities. *Id.* at ¶ 221. The complaints alleged personal injury and property damage resulting from DDT contamination (hereinafter referred to collectively as "the DDT claims"). *Id.* at ¶ 222. All of the lawsuits have been settled, at a cost to Olin of more than $80,000,000. *See*

Olin's Memorandum of Law at 6–7. There are currently no DDT claims pending against Olin.

## C. The Insurance Policies

In 1984, Olin commenced the present action against three of its four primary insurance carriers and a number of its excess insurance carriers, with whom it had contracted for liability insurance during the period January 1, 1950 through March 1, 1977. Olin seeks, *inter alia,* to recover from all defendants for indemnity, and from the primary insurers for its legal defense costs, in relation to the underlying DDT claims.

Defendant Wausau's policies, and those of a number of the Excess Insurers, contain a pollution exclusion clause exempting coverage for certain pollution-related damages. Those parties have moved for summary judgment on the ground that they have no liability to Olin by virtue of the pollution exclusion clauses. Defendant Hanover's policies, and those of all the excess insurers, limit liability to damages arising from "occurrences." Hanover and the excess insurers move for summary judgment on the ground that the release of DDT from the Huntsville plant was not an occurrence as that term is defined in the policies. Finally, Hanover moves for summary judgment on the alternative ground that even if there was an occurrence, Olin failed to give it timely notice of the occurrence and therefore it is absolved of all liability. The motions of the various insurers will be discussed in turn below.

## II. DISCUSSION

The motions presently before this Court require the interpretation of two clauses commonly included in commercial insurance policies: the occurrence definition and the pollution exclusion clause. Consequently, it is appropriate to begin with a brief discussion of the origin and purpose of these clauses.

## A. The Occurrence Definition and the Pollution Exclusion Clause

For many years, the insurance industry has promulgated "standard" insurance poli-

cies to serve as models for insurers to use in writing policies for their clients. *See* Note, *The Pollution Exclusion Clause Through the Looking Glass*, 71 Geo. L.J. 1237, 1240–41 (1986). These model policies contain a number of general clauses which insurers often incorporate more or less *verbatim* into the policies they write. One such model policy is the standard comprehensive general liability ("CGL") policy, which is intended to serve as a model for commercial and industrial coverage. *See id.*

Prior to 1966, the standard CGL policy provided for coverage of personal injuries and property damage "caused by accident." Accident-based coverage proved to be unsatisfactory to insurers, however, especially in the context of pollution-related claims, because different courts reached different results as to whether the term "accident" embraced the kind of gradually occurring damages or losses typical in cases of industrial pollution. *See id.* at 1241–44.

In 1966, the insurance industry changed its standard CGL policy by implementing a concept known as "occurrence-based coverage," in an attempt to promote greater predictability of interpretation. The standard CGL policy defined "occurrence" as:

> an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.[5]

*Id.* at 1246–47. The occurrence clause explicitly extends coverage to gradual losses, so long as such losses were not expected or intended by the insured. Courts have tended to read the occurrence clause broadly, drawing a distinction between the acts of the insured and the damages or losses resulting from those acts. *See id.* at 1248–50. Under the majority view, damages resulting from the *intentional acts* of the insured are covered, provided that the in-

sured did not intend to cause the resultant *damages*. Thus "a pollution related loss arising from an ongoing business practice of discharging pollutants, even if the discharge amounted to wilful and intentional malfeasance, was [typically held to be] covered as long as the ultimate loss was neither expected nor intended." *Id.* at 1250 (internal quotes and footnote omitted).

As environmental litigation increased in the late 1960s, the insurance industry decided to modify its standard CGL policy once again. In 1970, the industry added an exclusionary clause that was directed specifically at pollution-related claims. This so-called "pollution exclusion" clause provided that:

> [T]he insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.[6]

*Id.* at 1251.

The effect of the pollution exclusion clause is to create an exception to the broad occurrence coverage established by the standard CGL policy. Damages arising from the discharge of pollutants are not covered by the policy, even though they may constitute an occurrence. However, the pollution exclusion clause contains an internal exception—losses otherwise excluded from coverage by the terms of the clause are covered nonetheless if the discharge of pollutants that caused the losses was "sudden and accidental."

Thus, in interpreting an insurance policy containing the occurrence and pollution exclusion provisions in the context of an industrial pollution case, a court must engage in a three-step inquiry. The first step

---

5. The policies issued to Olin by most of the Excess Insurers contain occurrence definitions virtually identical to the language quoted above. *See* Part II(C) *infra*.

6. The policies issued to Olin by Wausau, and by many of the Excess Insurers, contain clauses almost *verbatim* to the standard pollution exclusion clause. *See* Parts II(B) and II(C), *infra*.

is to determine whether the occurrence definition is satisfied. To make this determination, the court must decide whether the *damages* for which coverage is claimed, as distinct from the act which caused the damages, were unexpected and unintended from the standpoint of the insured. If there was an occurrence, the court must proceed to the second step, which is to decide whether the pollution exclusion clause applies. To decide this question, the court must determine whether the losses for which coverage is claimed were caused by the discharge of a pollutant or other toxic substance. If the pollution exclusion clause applies, the court proceeds to the third step, which is to determine whether the internal exception within the pollution exclusion clause is invoked—that is, whether the discharge of the pollutant was "sudden and accidental". *See, e.g., United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33–34 (6th Cir. 1988) (discussing interplay of clauses); *American Motorists Ins. Co. v. General Host Corp.*, 667 F.Supp. 1423, 1429 (D.Kan. 1987) (same).

Having reviewed some background material regarding the occurrence and pollution exclusion clauses, this Court now turns to the specific motions for partial summary judgment made by the various parties. The standards which this Court must follow in determining a party's entitlement to summary judgment are well established. Summary judgment is appropriate where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law." Fed.R.Civ.P. 56(c). The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement "is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). The appropri-ate inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12. In conducting this inquiry, the court must construe the facts in the record in the light most favorable to the non-moving party. If the facts support an inference which would permit the non-moving party to prevail, summary judgment is inappropriate.

## B. Wausau's Motion for Summary Judgment

Wausau argues that under New York law it is entitled to summary judgment on the issue of its duty to defend and indemnify Olin for the losses Olin incurred as a result of the DDT claims. Wausau contends that the pollution exclusion clause in its policies with Olin applies to the DDT claims and that there can be no factual dispute that the release of DDT from the Huntsville plant was not "sudden and accidental". Olin counters by arguing that Connecticut law applies, that the pollution exclusion clause is inapplicable, and that there is a genuine factual dispute as to whether its release of DDT was sudden and accidental.

### 1. *Choice of Law*

 This Court must begin by addressing the threshold issue of which state's law applies to Wausau's motion for summary judgment in this diversity case. Federal courts sitting in diversity cases must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).[7] In cases in which an actual conflict of law exists, the New York rule requires courts to apply the law of the jurisdiction "which has the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99, 101–02 (1954).

---

7. Olin originally filed this case in the District Court for the District of Columbia. The case was transferred to this Court by stipulation of the parties. The stipulation provided that the case would be treated as though it had been filed in this District in the first instance. Accordingly, this Court will apply New York's choice of law principles.

In this case, Wausau argues for the application of New York law, while Olin contends that Connecticut law should govern. This Court finds it unnecessary to determine whether New York or Connecticut has the "most significant contacts" with the Wausau–Olin insurance policies because we perceive no conflict between the laws of the two states on the dispositive issue in this motion, the meaning of the pollution exclusion clause.

Two considerations support this conclusion. First, there are no reported Connecticut cases construing a pollution exclusion clause. As such, this Court may presume that Connecticut law is the same as that of New York, especially since the view of the New York courts seems to represent the emerging majority view on the interpretation of pollution exclusion clauses. *See Aetna Casualty & Sur. Co. v. General Time Corp.*, 704 F.2d 80, 82 (2d Cir.1983). Second, as discussed more fully below, this Court finds the language of the pollution exclusion clause to be plain and unambiguous. The rule in Connecticut, as in New York, is that courts are to apply the plain meaning of the words in a contract provision when the words are clear and unambiguous. *See Griswold v. Union Labor Life Ins. Co.*, 186 Conn. 507, 512–13, 442 A.2d 920, 923 (1982).

Olin argues that the Connecticut Supreme Court has commented, at least indirectly, on the meaning of the pollution exclusion clause and that the Connecticut view conflicts with that of New York. Olin points to *Verdon v. Transamerica Ins. Co.*, 187 Conn. 363, 446 A.2d 3 (1982), in which the Connecticut Supreme Court construed the word "casualty" in a state direct action statute. The Court defined casualty to mean "sudden and unexpected," and then went on to find that the word "sudden" was ambiguous, and did not necessarily imply a temporal element. *See* 446 A.2d at 6. Olin contends that the Connecticut Supreme Court's construction of "sudden" conflicts with New York law, under which the word "sudden" does have temporal significance.

This Court is of the opinion that *Verdon* does not create a conflict between Connecticut and New York law on the question of the construction of the pollution exclusion clause. The *Verdon* Court construed the word "sudden" in the context of interpreting the word "casualty" as used in a Connecticut statute, a context obviously different from a commercial insurance contract. The court itself specifically noted that its interpretation of the term might be different in other contexts. *See id.* In light of the fact that New York's construction of the pollution exclusion clause appears to represent the emerging majority view,[8] this Court concludes that if the Connecticut Supreme Court were to examine the clause, it would follow the construction adopted by the New York courts. Accordingly, this Court will apply New York law in passing upon the merits of Wausau's motion.

### 2. *The Merits of Wausau's Motion*

At issue in Wausau's motion is the question of whether Wausau has a duty to defend and indemnify Olin with regard to the DDT claims. Under New York law, the duty to defend and the duty to indemnify are distinct, the former being a broader duty than the latter. *See City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1148 (2d Cir.1989). In this case, however, Wausau's policy contained a clause limiting the duty to defend. The Wausau policy provided:

> Costs and expenses payable under the supplementary payments provision of the policy [e.g., defense fees and costs] shall be apportioned between [Wausau] and [Olin] in the proportion that the applicable retention bears to the total amounts payable by [Wausau], including such retention on account of all judgments and settlements resulting from any one occurrence....

Wausau Appendix, Vol. I, Exs. P–R. Wausau asserts, and Olin, in its opposition papers, does not dispute, that the purpose of the clause was to make Wausau's duty to defend commensurate with its duty to in-

---

**8.** *See* Part II(B)(2), *infra.*

demnify. Apparently the clause was inserted into the policy because Olin wanted to handle its own legal defense of liability claims. The clause obligates Wausau to share defense costs only to the extent it is liable for any judgment rendered or settlement entered. *See* Deposition of E. MacIntosh Cover (Olin's General Counsel), Wausau Appendix, Vol. I, Ex. T, p. 65; Wausau's Memorandum of Law in Support of its Motion for Partial Summary Judgment, p. 10. Consequently, in this case, Wausau has a duty to reimburse Olin for its legal expenses in defending the DDT claims only if Wausau has a duty to indemnify Olin for the payments it made in settlement of those claims.

The dispositive question, then, is whether Wausau has a duty to indemnify Olin for the costs it incurred in settling the DDT claims. Wausau's policy contained the standard occurrence definition and the standard pollution exclusion clause.[9] For purposes of this motion, Wausau concedes that the DDT claims resulted from an occurrence. Accordingly, the issue for this Court is whether the pollution exclusion clause absolves Wausau of any duty to indemnify Olin for the DDT claims.

In determining whether the pollution exclusion clause applies to the DDT claims, this Court must look to the complaints in the underlying DDT lawsuits against Olin. Those complaints alleged Olin's liability for personal injury and property damage resulting from the release of DDT from Olin's Huntsville plant. *See* Olin's Memorandum of Law at 6; Olin Exs. 5–12. The complaints were premised upon a number of different theories of liability, including intentional release of DDT, negligence, failure to warn, public nuisance and strict liability. *See* Wausau Appendix, Vol. I, Ex. J; Olin's Memorandum of Law at 9–11. Olin settled the lawsuits by making undifferentiated payments which were not based upon a specific theory of liability. *See* Olin's Memorandum of Law at 11–12.

The pollution exclusion provision in the Wausau policy provides, in part, that

"This insurance does not apply ... to personal injury or property damage arising out of the ... release or escape of ... toxic chemicals, liquids or ... waste materials ... into or upon the land, the atmosphere or any water course or body of water...."

Wausau Appendix, Vol. I, Exs. P–R. Interpreting an identical pollution exclusion clause in *Technicon Electronics Corp. v. American Home Assurance Co. ("Technicon II")*,[10] 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989), the New York Court of Appeals concluded that in order for the pollution exclusion provision to apply, "the complaint with respect to which coverage is sought must allege a discharge, dispersal, release or escape of a toxic or hazardous waste which has actually resulted in pollution." *Id.* at 74, 542 N.E.2d at 1050, 544 N.Y.S.2d at 533.

In this case, each of the underlying complaints alleges the release or escape of DDT from Olin's plant, resulting in pollution and accompanying property damage and personal injury. As such, there can be no doubt that the pollution exclusion clause in the Wausau policy applies to the underlying DDT claims, with the result that Wausau has no duty to indemnify Olin unless the release of DDT from the Olin plant was "sudden and accidental".

■ Olin puts forward two arguments in support of its contention that the pollution exclusion clause does not apply in this case. We find neither of these arguments to be persuasive. First, Olin argues that the clause does not apply because Olin had closed the Huntsville plant and stopped producing DDT some three and one-half years before it purchased the Wausau policies. The pollution exclusion clause should not be applied "retroactively" to events occurring before its purchase of the Wausau policies, Olin contends, because the

9. *See* Wausau policies, in Wausau Appendix, Vol. I, Exs. P–R.

10. The Court of Appeals opinion will be referred to hereinafter as *Technicon II* to distinguish it

from the Appellate Division opinion which it affirmed. The Appellate Division opinion, reported at 141 A.D.2d 124, 533 N.Y.S.2d 91 (App. Div.1988), will be referred to as *Technicon I.*

purpose of the clause is to deter pollution prospectively. This Court perceives nothing in the language of the exclusion clause which supports Olin's contention that the clause was intended to apply only to future instances of pollution. Applying the plain language of the clause, we conclude that it was intended to bar coverage for all pollution claims, regardless of whether the pollution event occurred before or after the policy came into force. *See Powers Chemco, Inc. v. Federal Ins. Co.*, 144 A.D.2d 445, 447–48, 533 N.Y.S.2d 1010, 1011–12 (App.Div.1988) (pollution exclusion clause barred coverage although toxic materials had been buried on insured's property by former owner without insured's knowledge), *aff'd*, 74 N.Y.2d 910, 548 N.E.2d 1301, 549 N.Y.S.2d 650 (1989).

■ Second, Olin claims that the pollution exclusion clause should not be applied because the alleged pollutant in this case, DDT, was Olin's "product". Olin claims that to exclude coverage for damages caused by its product would deny it the coverage for which it paid premiums. We disagree. Olin's product was the pure industrial-grade DDT which it shipped to its customers, not the DDT-bearing effluent which it released into the waste water ditches. The same substance may be a useful product when employed for its intended purpose and yet still be a pollutant when inappropriately introduced into the environment.[11] *See International Surplus Lines Ins. Co. v. Anderson Development Co.*, No. 86–CV–60392–AA, slip op. (E.D.Mich. October 19, 1987). Thus the fact that Olin manufactured DDT does not remove the DDT-bearing effluent from the ambit of the pollution exclusion clause.

Having determined that the pollution exclusion clause applies in this case, the next issue is whether the release of DDT from the Huntsville plant was "sudden and accidental" within the meaning of the internal exception to the clause. The final phrase in the pollution exclusion clause in the Wausau policies states: "this exclusion does not apply if such discharge, dispersal, release or escape [of a pollutant] is sudden and accidental." *See* Wausau Appendix, Vol. I, Exs. P–R. Since the phrase is expressed in the conjunctive, both requirements must be met in order for the exception to the pollution exclusion clause to apply. *See Technicon II*, 74 N.Y.2d at 75, 542 N.E.2d at 1050, 544 N.Y.S.2d at 533.

■ The first question, then, is whether the release of DDT from the Olin plant was "sudden". Under New York law, the word "sudden" implies a temporal element. Thus an event which lasts for an extended period of time is not "sudden". *See Technicon Elec. Corp. v. American Home Assur. Co. ("Technicon I")*, 141 A.D.2d 124, 134, 533 N.Y.S.2d 91, 97 (App.Div.1989), *aff'd*, 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989). New York's interpretation comports with the meaning given to the word in everyday usage. *See id.; State of N.Y. v. Amro Realty Corp.*, 697 F.Supp. 99, 110 (N.D.N.Y.1988); *see also The Random House Dictionary of the English Language* 1900 (2d ed. 1987). As explained by one court:

> No use of the word "sudden" or "suddenly" could be consistent with an event which happened gradually over an extended period of time. . . . The language is clear and plain, something only a lawyer's ingenuity could make ambiguous.

*American Motorists*, 667 F.Supp. at 1428–29. This Court's review of the many authorities cited by the parties leads to the conclusion that the view adopted by the New York courts—that the meaning of the term "sudden", as used in the pollution exclusion clause, is plain and unambiguous—is in keeping with the emerging majority view among the courts. *See Technicon I*, 141 A.D.2d at 133–37, 533 N.Y.S.2d at 96–99 (collecting cases); *American Motorists*, 667 F.Supp. at 1427–31 (same); Wausau's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, p. 23 n. 50 (citing cases).

---

**11.** The Exxon "Valdes" incident provides a useful analogy. While it is indisputable that petroleum is Exxon's product, it is equally clear that the petroleum aboard the "Valdes" constituted a pollutant when it was spilled into the waters off Alaska.

■ In the instant case, the record shows that the discharge of DDT from the Huntsville plant occurred over the entire sixteen year period that Olin operated the plant. As early as 1955, Olin engineers Morgan and Trapane had noticed DDT in the waste water trenches outside the plant and had determined that small amounts of DDT were present in the plant effluent. Indeed, Olin does not seriously dispute that DDT was present in its effluent on a continuing basis over the period that it operated the plant. *See* Olin's Memorandum of Law at 24 & n. 29; Deposition of John Delaney, Jr. (Olin's Assistant Treasurer and Risk Manager), Wausau Appendix, Vol. II, Ex. J, pp. 561–62 (conceding that discharge of DDT from plant was a "gradual discharge occurring over a number of years"). Such an ongoing discharge of DDT cannot be characterized as "sudden", as that term is commonly used and defined by New York law. Therefore, this Court holds that there is no genuine dispute as to the fact that the discharge of DDT from the Huntsville plant was not sudden. Accordingly, the internal exception to the pollution exclusion clause is not invoked and Wausau has no duty to indemnify Olin.

■ Even if the discharge of DDT from the plant somehow could be construed as "sudden", Wausau still would be entitled to summary judgment because the discharge was not "accidental". Under New York law, "accidental" means "unintended" or "unexpected". *See Technicon I*, 141 A.D.2d at 134, 533 N.Y.S.2d at 99; *see also Technicon II*, 74 N.Y.2d at 75, 542 N.E.2d at 1049–50, 544 N.Y.S.2d at 534. In applying the pollution exclusion clause, the focus of the inquiry is upon whether the *discharge* of the pollutant, and not the resulting damage, was unintentional or unexpected. *See id.* at 74–76, 542 N.E.2d at 1050–51, 544 N.Y.S.2d at 533–34; *see also United States Fidelity & Guar. Co.*, 856 F.2d at 34.

In this case, the discharge of DDT from Olin's plant cannot be described as accidental. The facts adduced by the parties on this motion show that Olin knew that DDT was being discharged in the plant effluent.

Therefore the discharge was, at minimum, expected by Olin. Olin was repeatedly put on notice, by its own employees and by others, that there was DDT in its effluent and in the Huntsville Spring Branch. At least by 1961, when Mr. Jimmie Reid showed Mr. Wilcoxin photographs of the DDT "delta" at the confluence of the Olin drainage ditch and the Huntsville Spring Branch, Olin had notice that DDT was escaping from its plant into the surrounding waterways.

Olin claims that it did not know that the DDT in its effluent was actually reaching the Huntsville Spring Branch. Given the overwhelming evidence available to Olin of the pollution of the Branch, this Court concludes that Olin's alleged ignorance could only have resulted from an intentional aversion of its corporate eyes from the problem. We therefore find that on the record before this Court, Olin, at minimum, expected that DDT would escape from its plant via the effluent and reach the surrounding waterways. As such, the escape of DDT was not "accidental" as that term is used in the internal exception to the pollution exclusion clause.

In sum, this Court finds that DDT is a pollutant within the meaning of the pollution exclusion clause and that there is no genuine dispute as to the fact that the release of DDT from the Huntsville plant was neither sudden nor accidental. We therefore conclude, as a matter of law, that the pollution exclusion clause applies to the underlying DDT claims and absolves Wausau of any duty to indemnify Olin for those claims. Accordingly, Wausau's motion for partial summary judgment is granted.

C. The Excess Insurers' Motions for Partial Summary Judgment

At issue in the Excess Insurers' motions are forty-one excess insurance policies issued to Olin since 1954. The Excess Insurers move for summary judgment on two grounds: (1) that the pollution exclusion clauses contained in many of the excess policies bar any liability to Olin; and (2) that the discharge of DDT from the Hunts-

ville plant was not an occurrence as that term is defined in the policies.

### 1. *The Policies*

All forty-one of the policies issued by the Excess Insurers provide that Olin will be indemnified for damages arising out of occurrences. Two different definitions of "occurrence" are used in the policies. Thirty-four of the excess policies define an "occurrence" as "an accident or a happening or event ... which unexpectedly and unintentionally results in personal injury [or] property damage." [12] The remaining seven policies define "occurrence" as "one happening or series of happenings ... during the term of this policy." [13]

Thirty-four of the policies contain pollution exclusion clauses. Three slightly different versions of the pollution exclusion clause are contained in those policies, the most salient distinction being whether the exclusion applies only to property damage or to both personal injury and property damage claims.

Twenty of the thirty-four policies contain clauses which exclude liability for "Property damage caused by ... pollution ... [unless such pollution is] caused by a sudden, unintended and unexpected happening." [14] Thirteen of the remaining fourteen policies contain a provision almost identical to the one quoted above but which extends coverage to both property damage and personal injury.[15] Finally, one of the thirty-four pol-

**12.** The full text of the provision reads:
> an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

These policies containing this provision are: American Home Insurance Company Policies Numbered CE 351099, CE 355541 and CE 2692186; American Reinsurance Company Policies Numbered 97219 and 0087430; Continental Insurance Company (CNA) Policies Numbered RDX 9561640, RDX 9682503 and RDX 9896836; Falcon Insurance Company and Commercial Union Insurance Company Policies Numbered ESLIC S–10816, ELAC E16–8057–001, ELAC E16–8057–002, ELAC E16–8057–003, ELAC E16–8057–004, ECU EY–8057–011, ECU EY–8057–012, ECU EY–8057–013, and ECU EY–8057–021; Federal Insurance Company Policies Numbered 7701–49–10, 7932–83–22, 7933–00–04 and (79) 7933–00–04; Fireman's Fund Insurance Company Policies Numbered XL 23655, XL 90461, XLX 1027769 and XLX 1050883; Great American Insurance Company Policy Numbered LCA 6356391; Lexington Insurance Company Policy Numbered 5211274; National Union Insurance Company Policies Numbered 122–96–16, 122–52–88, 978–25–61, 991–05–51, 960–30–76 and 960–70–72; and Northbrook Insurance Company Policy Numbered 63004246.

**13.** The full text of the provision states:
> [O]ne happening or series of happenings, arising out of or due to one event taking place during the term of this policy.

The policies containing this provision are: American Reinsurance Company Policies Numbered M–8151–01 and M–8151–02; Continental Insurance Company (CNA) Policy Numbered RDX 9992989; Falcon Insurance Company and

Commercial Union Insurance Company Policy Numbered ESLIC S–10326; Federal Insurance Company Policy Numbered 7701–45–87; Fireman's Fund Insurance Company Policy Numbered SN 7005; and National American Insurance Company Policy Numbered 59–05–159DE.

**14.** The full text of the provision states that the policy does not cover:
> Property damage caused by seepage, pollution or contamination, unless such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance....

The policies containing this provision are: American Home Insurance Company Policies Numbered CE 351099, CE 355541 and CE 2692186; American Reinsurance Policy Numbered 0087430; Continental Insurance Company (CNA) Policies Numbered RDX 9561640, RDX 9682503, and RDX 9896836; Falcon Insurance Company and Commercial Union Insurance Policies Numbered ESLIC S–10816, ELAC E16–8057–001, ELAC E16–8057–002, ELAC E16–8057–003, ELAC E16–8057–004, ECU EY8057011, ECU EY8057–012, and ECU EY8057–013; Federal Insurance Company Policy Numbered 77014910; Fireman's Fund Insurance Company Policies Numbered XL 23655, XL 90461 and XL 1027769; and Great American Insurance Company Policy Numbered LCA 6356391.

**15.** The full text of the provision reads:
> This insurance does not cover any liability for: Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly, caused by seepage, pollution or contamination, provided always that this paragraph shall not apply to liability for Personal Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or de-

icies, American Reinsurance Policy Number 97219, contains an exclusion clause identical to the "standard" pollution exclusion clause promulgated by the insurance industry.[16]

### 2. *The Merits of the Excess Insurers' Motions*

The first issue which must be addressed by this Court is which state's law applies to the Excess Insurers' motions. The Excess Insurers argue that New York law governs the interpretation of the excess policies, while Olin contends that Connecticut law should apply. In our prior Opinion in this case, *Olin Corp. v. INA*, 743 F.Supp. 1044, 1048–50 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir.1991), this Court considered the choice of law question with respect to the same excess policies at issue here in the context of other claims for which Olin sought indemnification. We determined that New York law governed the interpretation of the excess policies, *see id.* at 1049–50, and we perceive no reason to depart from that conclusion here. In any event, this Court is of the opinion that there is no conflict between the law of New York and the law of Connecticut with respect to the pollution exclusion and occurrence clauses at issue in this motion. *See* Part II(B), *supra.* Accordingly, we hold that New York law governs the interpretation of the excess insurance contracts.

Turning to the merits of the motions, this Court notes that none of the excess policies contains a provision obligating the insurer to defend Olin or pay for its legal defense costs. *See* Transcript of Oral Argument, October 4, 1990 ("tr."), p. 29. Therefore the only issue on these motions is whether there is a genuine dispute as to the Excess Insurers' duty to indemnify Olin for the losses it sustained as a result of the DDT claims.

Earlier in this Opinion, this Court held that the pollution exclusion clause in the Wausau policies barred coverage for the DDT claims. With regard to those policies of the Excess Insurers which contain pollution exclusion clauses, then, the dispositive question is whether the wording of those clauses is sufficiently different from the wording of the Wausau clause so as to compel a different result.

This Court finds that there is no meaningful difference between the wording of the pollution exclusion clauses in the Excess Policies and that in the Wausau policy. All of the pollution exclusion clauses in the Excess Policies bar coverage for losses caused by the escape of a pollutant. Therefore, the damages caused by the release of DDT from the Huntsville plant fall within the ambit of the exclusion clauses.

The only difference between the wording of the Wausau pollution exclusion and the wording of the exclusions in the Excess Policies appears in the "internal exception" portion of the clause. The exclusion clauses in all but one [17] of the Excess Policies reinvoke coverage where pollution is caused by "a sudden, unintended or unexpected *happening*." Olin urges that the use of the word "happening" somehow distinguishes the pollution exclusion clauses in the Excess Policies from that in the Wausau policy. We disagree. In this case, the "happening" that caused the release of DDT was the presence of DDT in the effluent from the Olin plant. The undisputed facts of this case show that this "happening" was neither sudden nor unexpected. *See* Part II(B), *supra.* This Court there-

---

stroyed, where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.

The policies containing this provision are: Falcon Insurance Company and Commercial Union Insurance Company Policy Numbered ECU8057–021; Federal Insurance Company Policies Numbered 7932–83–22, 7933–00–04; and (79) 7933–00–04; Fireman's Fund Insurance Company Policy Numbered XLX 1050883; Lexington Insurance Company Policy Numbered 5211274; National Union Insurance Company Policies Numbered 122–96–16, 122–52–88, 978–25–61, 991–05–51, 960–30–76, and 960–70–72; and Northbrook Insurance Company Policy Numbered 63004246.

**16.** For the text of this provision, *see* Part II(A), *supra.*

**17.** The wording of American Reinsurance Policy Number 97219 follows that of the Wausau policy.

fore holds, as a matter of law, that coverage of the DDT claims is barred by the pollution exclusion clauses in the Excess Policies. Accordingly, the Excess Insurers' motions for partial summary judgment are granted to the extent they are based on the pollution exclusion clause issue.

■ As noted above, some of the excess policies do not contain pollution exclusion clauses, and other policies contain the exclusion but limit its application to property damage claims. Consequently, the pollution exclusion issue is not dispositive of all of the Excess Insurers' motions and this Court must go on to consider the second issue raised by the motions—whether the release of DDT from the Huntsville plant was an "occurrence", as that term is defined in the Excess Policies.

In *City of Johnstown*, 877 F.2d at 1148–51, the Second Circuit construed an occurrence provision in an insurance contract under New York law. The occurrence provision at issue in *City of Johnstown* was almost identical to the "standard" occurrence definition promulgated by the insurance industry. The provision provided coverage for "an accident, including continuous or repeated exposure to the same event, that results ... in bodily injury ... or property damage ... [if such] injury or damage ... [is] neither expected nor intended by the insured." *Id.* at 1149. The Court construed the occurrence definition broadly, holding that pollution-related damages were an occurrence unless the insured intended the *damages* to occur, or unless the damages were so likely to result from the insured's actions that the insured could be said to have constructively intended the damages. *See id.* at 1150–51. As explained by the Court,

In general, what make injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured. It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before. Recovery will be barred only if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.

*Id.* at 1150 (citations omitted).

In this case, the occurrence definitions in the Excess Policies are at least as broad in scope as the provision construed in *City of Johnstown*. The majority of the policies employ the "unexpected and unintended" language characteristic of the standard occurrence definition and of the provision at issue in *City of Johnstown*. Seven of the Excess Policies define "occurrence" even more broadly as a "happening".

■ Since all of the occurrence provisions in the Excess Policies are at least as broad in scope as the provision construed in *City of Johnstown*, the Excess Insurers would be entitled to summary judgment only if they could show, at minimum, that Olin possessed actual or constructive intent with regard to the damages that resulted from the release of DDT from the Huntsville plant. On the record before this Court, we find that the Excess Insurers have not met this heavy burden with regard to the issue of Olin's intent. Issues of scienter generally are not amenable to resolution on a motion for summary judgment because they usually turn on questions of witness perception and credibility. In this case the dispositive question will be what Olin's executives knew, when they knew it, and what conclusions they drew from their knowledge. The definitive answers to these questions cannot be gleaned from the cold record before this Court.

There is, to be sure, strong evidence that at least by the mid–1960s Olin's knowledge of DDT contamination in the Huntsville Spring Branch, combined with its awareness of the dangers of DDT, was such that Olin should have known that damages would result from the continued release of DDT–bearing effluent from its Huntsville plant. However, in ruling upon this motion for summary judgment, this Court is required to draw all reasonable inferences in favor of Olin, the non-movant. Because the evidence presented by the parties permits the inference that Olin did not "in-

tend" to cause the damages that underlay the DDT claims, as the term "intend" is defined under New York law, this Court must deny the Excess Insurers' motions on the occurrence issue.

To summarize, this Court grants the Excess Insurers' motions for partial summary judgment insofar as they are based on the pollution exclusion issue. However, we deny the Excess Insurers' motions to the extent they are based on the occurrence issue.

### D. Hanover's Motion for Partial Summary Judgment

 Hanover provided Olin's primary layer of comprehensive general liability coverage for policy periods from January 1, 1954 until June 1, 1955. Hanover moves for partial summary judgment with respect to its liability for the DDT claims on two grounds: (1) that the release of DDT from the Huntsville plant was not an occurrence within the coverage of the Hanover policies; and (2) that even if there was an occurrence, Hanover is absolved of any liability to defend or indemnify Olin because of Olin's failure to give Hanover timely notice of the Huntsville occurrence. This Court finds the second ground raised by Hanover to be dispositive. Therefore we need not reach the occurrence issue, and for purposes of evaluating the late notice claim we will assume that the discharge of DDT from the Huntsville plant constituted an occurrence.

The 1954 and 1955 Hanover policies contained the same notice provision. Both policies provided as follows:

8. Notice of [Occurrence]. When an [occurrence] occurs written notice shall be given on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place, and circumstances of the [occurrence], the names and addresses of the injured and available witnesses.

9. Notice of Claim or Suit. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

*See* Affidavit of Dale C. Christensen, Jr. ("Christensen Aff."), dated November 30, 1989, Exs. E & F.

There is no dispute between the parties as to the crucial facts regarding Olin's provision of notice to Hanover. Olin concedes that it did not provide notice to Hanover until the early part of November, 1981. *See* Memorandum of Law of Olin Corporation in Opposition to the Motion for Partial Summary Judgment of the Hanover Insurance Company, p. 9. Olin had provided notice to its other two primary insurance carriers, the Insurance Company of North America and Wausau, some twenty months earlier. *See* Christensen Aff. at ¶ 43. The first of the underlying DDT lawsuits was filed on July 9, 1979. *See id.* at ¶ 42.

New York law governs the question of whether Olin's notice to Hanover was timely. This Court so held in its prior Opinion in this case. *See Olin Corp.*, 743 F.Supp. at 1049–50. That conclusion is the law of this case and, in any event, this Court perceives no reason to depart from it.

 The law of New York with regard to the late notice issue is set out in detail in this Court's prior Opinion, *see id.* at 1050–55, and will be summarized only briefly here. Under New York law, "compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir.1987) (citations omitted). Coverage is completely barred by the insured's failure to give timely notice, whether or not the insurer was prejudiced by the delay. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 121 (2d Cir.1984).

In evaluating a late notice defense, a court must undertake two inquiries. First, the court must determine when the obligation to give notice accrued. Under New

York law, the obligation accrues when "the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Commercial Union*, 822 F.2d at 272 (citations omitted). Second, the court must determine whether the insured did in fact provide timely notice, which the courts have uniformly defined as notice given within a reasonable time under all the circumstances. *See Olin Corp.*, 743 F.Supp. at 1049–51 (collecting cases). Absent a reasonable excuse or mitigating factors, even relatively short periods of delay have been found to be unreasonable as a matter of law. *See, e.g., Commercial Union*, 822 F.2d at 272 (eighteen months); *Utica Mutual*, 748 F.2d at 121 (six months); *Power Authority of New York v. Westinghouse Elec. Corp.*, 117 A.D.2d 336, 343, 502 N.Y. S.2d 420, 423 (App.Div.1986) (fifty-three days).

In this case, Olin's obligation to give notice of the Huntsville occurrence accrued, at the latest, when the first of the underlying DDT lawsuits was filed on July 9, 1979. Olin failed to notify Hanover until November of 1981, some two and one-half years after the first of the underlying lawsuits was filed and approximately twenty months after it gave notice to its other primary insurance carriers. This Court finds that delay to be unreasonable as a matter of law.

Olin argues that it should be excused for its failure to provide timely notice because it did not locate the Hanover policies in its archives until November 4, 1981, despite having conducted a diligent search. However, the evidence submitted by Hanover demonstrates that Olin was aware of the Hanover policies at least as early as 1977. At that time Olin's former subsidiary, Squibb, gave Hanover notice of claims against it, on behalf of itself and Olin, pursuant to the same policies at issue on this motion. *See* Wausau Reply Exs. J, K. Consequently, this Court rejects Olin's proffered excuse for providing late notice to Hanover.

Because Olin's notice to Hanover of the Huntsville DDT occurrence was untimely as a matter of law, Hanover is absolved of any duty to defend or indemnify Olin with respect to the DDT claims. Accordingly, Hanover's motion for partial summary judgment is granted.

## CONCLUSION

For the reasons stated above, Wausau's motion for partial summary judgment is granted. The Excess Insurers' motions for partial summary judgment are granted to the extent that they are based on the pollution exclusion issue, but are denied to the extent that they are based on the occurrence issue. Hanover's motion for partial summary judgment is granted on the late notice issue.

In view of this Court's holding with regard to the Hanover policies, the pending motion on the threshold issue of Hanover's coverage of Olin, scheduled for oral argument on May 9, 1991, is denied as moot. The parties are to advise this Court no later than May 1, 1991 of any outstanding matters with respect to the Huntsville DDT claims that have not been resolved in this Opinion.

SO ORDERED.